# United States Court of Appeals

## For the First Circuit

No. 04-2186

GREGORIO IGARTÚA-DE LA ROSA, ET AL.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. Senior District Judge]

Before

Boudin, Chief Judge,

Campbell, Senior Circuit Judge,

Torruella, Selya, Lynch, Lipez and Howard, Circuit Judges.

Gregorio Igartúa-de la Rosa for appellants.
Francisco J. Domenech with whom Angel J. Vargas-Carcaña, Office of the Legal Counsel & Federal Affairs for the President, Senate of Puerto Rico, was on brief for the Senate of the Commonwealth of Puerto Rico and its President, the Honorable Kenneth D. McClintock, Amicus Curiae.
Richard H. Fallon, Jr. with whom José A. Fuentes-Agostini, Reed Smith LLC, John M. García, García & Fernández PSC, Joaquín A. Márquez, Philip J. Mause and Drinker Biddle & Reath LLP were on brief for the Puerto Rican-American Foundation, joined by the Republican Party of Puerto Rico, Amici Curiae.
Amy B. Abbott, Kirkpatrick & Lockhart Nicholson Graham LLP, Glenn R. Reichardt, Shanda N. Hastings, Kirkpatrick & Lockhart Nicholson Graham LLP on brief for Dick Thornburgh and Citizens' Educational Foundation-US, Amici Curiae.

          Gael Mahony, Stephen S. Young, Martha Born, Holland & Knight
LLP and Israel Roldán-González on brief for Israel Roldán-González,
Amicus Curiae.
          Gregory G. Katsas, Deputy Assistant Attorney General, with
whom Peter D. Keisler, Assistant Attorney General, H.S. García,
United States Attorney, Michael Jay Singer and Matthew M. Collette,
Appellate Staff, Civil Division, Department of Justice, were on
brief for appellee.

---

August 3, 2005

---

OPINION EN BANC

**Boudin, <u>Chief Judge</u>**.  This case brings before this court the third in a series of law suits by Gregorio Igartúa, a U.S. citizen resident in Puerto Rico, claiming the constitutional right to vote quadrennially for President and Vice President of the United States.  Panels of this court have rejected such claims on all three occasions.[1]  We now do so again, this time <u>en banc</u>, rejecting as well an adjacent claim: that the failure of the Constitution to grant this vote should be declared a violation of U.S. treaty obligations.

The constitutional claim is readily answered.  Voting for President and Vice President of the United States is governed neither by rhetoric nor intuitive values but by a provision of the Constitution.  This provision does not confer the franchise on "U.S. citizens" but on "Electors" who are to be "appoint[ed]" by each "State," in "such Manner" as the state legislature may direct, equal to the number of Senators and Representatives to whom the state is entitled.  U.S. Const. art. II, § 1, cl. 2; <u>see also</u> <u>id.</u> amend. XII.

At one time state legislatures chose the electors themselves, <u>see</u> <u>McPherson</u> v. <u>Blacker</u>, 146 U.S. 1, 28-35 (1892); in

---

[1]<u>Igartua de la Rosa</u> v. <u>United States</u>, 32 F.3d 8 (1st Cir. 1994) ("<u>Igartúa I</u>"); <u>Igartua de la Rosa</u> v. <u>United States</u>, 229 F.3d 80 (1st Cir. 2000) ("<u>Igartúa II</u>"); <u>Igartúa-de la Rosa</u> v. <u>United States</u>, 386 F.3d 313 (1st Cir. 2004) ("<u>Igartúa III</u>").  The panel in <u>Igartúa III</u> vacated its own decision and granted panel rehearing, 404 F.3d 1 (1st Cir. 2005); and this court then granted <u>en banc</u> review, 407 F.3d 30 (1st Cir. 2005).

the modern manner, customarily a U.S. state provides that its own citizens--citizens of that state--vote for the electors to represent that state. Modern ballots may omit the names of the electors and list only the candidates, so in form it appears that citizens are voting for President and Vice President directly. But they are not: they are voting for electors and, more pertinent here, the electors are electors of the states.

Puerto Rico--like the District of Columbia, the Virgin Islands, and Guam--is not a "state" within the meaning of the Constitution. Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 7 (1st Cir. 1992). Puerto Rico was not one of the original 13 states who ratified the Constitution; nor has it been made a state, like the other 37 states added thereafter, pursuant to the process laid down in the Constitution. U.S. Const. art. IV, § 3, cl. 1. Nor has it been given electors of its own, as was the District of Columbia in the Twenty-Third Amendment.

Puerto Rico became associated with the United States as an unincorporated territory under Article IV of the Constitution following the 1898 war between this country and Spain. U.S. Const. art. IV, § 3, cl. 2; see Insular Cases, 182 U.S. 1 (1901). Its status has altered over the ensuing period, culminating in an agreement in 1952, approved by the citizens of Puerto Rico, that Puerto Rico should have a unique "Commonwealth" status; but the unique status is not statehood within the meaning of the

Constitution.  See Trailer Marine, 977 F.2d at 7; Igartúa II, 229 F.3d at 87-88 & nn.15-16 (Torruella, J., concurring).  And, in recent elections, Puerto Ricans themselves have been substantially divided as to whether to seek statehood status.  Cf. Rossello-Gonzalez v. Calderon-Serra, 398 F.3d 1, 4-5 (1st Cir. 2004).

As Puerto Rico has no electors, its citizens do not participate in the presidential voting, although they may do so if they take up residence in one of the 50 states and, of course, they elect the Governor of Puerto Rico, its legislature, and a non-voting delegate to Congress.  Like each state's entitlement to two Senators regardless of population, the make-up of the electoral college is a direct consequence of how the framers of the Constitution chose to structure our government--a choice itself based on political compromise rather than conceptual perfection. Note, Rethinking the Electoral College Debate: The Framers, Federalism, and One Person, One Vote, 114 Harv. L. Rev. 2526, 2526-31 (2001) (discussing historical commentary).

That the franchise for choosing electors is confined to "states" cannot be "unconstitutional" because it is what the Constitution itself provides.  Hence it does no good to stress how important is "the right to vote" for President.  Although we recognize the loyalty, contributions, and sacrifices of those who are in common citizens of Puerto Rico and the United States, much the same could have been said about the citizens of the District of

-5-

Columbia, who were voteless over a much longer period. The path to changing the Constitution lies not through the courts but through the constitutional amending process, U.S. Const. art. V; and the road to statehood--if that is what Puerto Rico's citizens want-- runs through Congress. U.S. Const. art. IV, § 3, cl. 1.

This court has thrice rejected the constitutional claim now advanced by Igartúa. The Ninth Circuit reached the same result in a similar suit concerning Guam. <u>Attorney General of the Territory of Guam</u> v. <u>United States</u>, 738 F.2d 1017 (9th Cir. 1984). The Supreme Court denied certiorari in both <u>Igartúa I</u>, 514 U.S. 1049 (1995), and in the Ninth Circuit case, 469 U.S. 1209 (1985). Igartúa has offered nothing new in this third case to support his constitutional claim. In this <u>en banc</u> decision, we now put the constitutional claim fully at rest: it not only is unsupported by the Constitution but is contrary to its provisions.

Igartúa's complaint also relied upon U.S. treaties-- technically, two of the three are not treaties--as a premise for the suffrage right claimed.[2] This theory had been advanced and rejected by this court in <u>Igartúa I</u>, 32 F.3d at 10 n.1, which was

---

[2]The first two of the three documents are not "treaties" in the constitutional sense, being instead aspirational documents never submitted by the President for Senate ratification. U.S. Const. art. II, § 2, cl. 2. Neither is listed in the State Department's current "treaties in force" list. U.S. Department of State, <u>Treaties in Force 2004</u>, <u>at</u> www.state.gov/s/l/38294.htm. For convenience, we ignore the distinction because it does not affect the result in this case.

-6-

binding on the panel and could not be altered by it. Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 160 & n.4 (1st Cir. 2004). After the panel granted rehearing in this case to examine a more elaborate version of the treaty argument, the en banc court determined that the matter should be heard by the full court. Two of the three panel members said that they were content with this course. Only one judge dissented from the proposal to hear the case en banc. See Igartúa de la Rosa, 407 F.3d 30.

No treaty claim, even if entertained, would permit a court to order that the electoral college be enlarged or reapportioned. Treaties--sometimes--have the force of domestic law, just like legislation; but the Constitution is the supreme law of the land, and neither a statute nor a treaty can override the Constitution. Reid v. Covert, 354 U.S. 1, 16-18 (1957) (plurality opinion); Matter of Burt, 737 F.2d 1477, 1484 (7th Cir. 1984); Plaster v. United States, 720 F.2d 340, 348 (4th Cir. 1983) (collecting case law). See also Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 180 (1803) ("a law repugnant to the constitution is void"). So the treaty claim, originally made in support of injunctive relief, is now recast by proponents as a demand for "a declaration" that the United States is in violation of its treaty obligations for failing to "take steps" to give a presidential vote to citizens of Puerto Rico.

There are a host of problems with the treaty claim, including personal standing, redressability, the existence of a cause of action, and the merits of the treaty interpretations offered. Treaties are made between states (in the international usage of that term) and citizens do not automatically have a right to sue upon them.[3] The present claim is also probably not justiciable in the sense that any effective relief could be provided;[4] it is enough to let common sense play upon the conjecture that the Constitution would be amended if only a federal court declared that a treaty's generalities so required. See Simon, 426 U.S. at 44 ("unadorned speculation [as to redress] will not suffice to invoke the federal judicial power").

Nor are the merits of Igartúa's reading of the treaties at all straightforward. The language of each of the treaties invoked is general. Nothing in them says anything about just who should be entitled to vote for whom, or that an entity with the

---

[3]See United States v. Li, 206 F.3d 56, 60-61 (1st Cir. 2000) (en banc) ("[T]reaties do not generally create rights that are privately enforceable in the federal courts" (citing Head Money Cases, 112 U.S. 580, 598 (1884)); id. at 61 ("presumption against private rights of action under international treaties").

[4]Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976) (unless injury is "likely to be redressed by a favorable decision," federal court's exercise of power "would be gratuitous and thus inconsistent with the Art. III limitation"); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)(redressability must not be "speculative"). See also Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103-04, 103 n.5 (1998) (redressability at "core" of Article III).

negotiated relationship that the United States has with Puerto Rico is nevertheless required to adopt some different arrangement as to governance or suffrage.  In 1951, Puerto Ricans themselves acceded to their present Commonwealth status,[5] and they are today divided as to what relationship they would prefer on the spectrum from statehood to Commonwealth status to independence.

We think it unnecessary to plumb these questions, whether of preconditions to suit or the meaning of the treaties, because none of these treaties comprises domestic law of the United States and so their status furnishes the clearest ground for denying declaratory relief.  It is well settled that declaratory relief is discretionary, Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995), but discretion does not mean anything that a judge feels like doing.  Rather,

> the discretion to grant declaratory relief is to be exercised with great circumspection when matters of public moment are involved, . . . or when a request for relief threatens to drag a federal court prematurely into constitutional issues that are freighted with uncertainty.

---

[5]See G.A. Res. 748 (VIII), U.N. GAOR, 8th Sess., 459th plen. mtg. at 26 (1953) (United Nations General Assembly, upon formation of "political association" between United States and Puerto Rico, "[r]ecognizes that the people of the Commonwealth of Puerto Rico, by expressing their will in a free and democratic way, have achieved a new constitutional status" and "that, when choosing their constitutional and international status, the people of the Commonwealth of Puerto Rico have effectively exercised their right to self-determination").

Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530, 535 (1st Cir. 1995).

It would not be "circumspection" but patent imprudence to "declare" purported rights under the treaties at issue in this case. The United States has signed numerous treaties over the years, many containing highly general and ramifying statements. Some as negotiated by the President are merely aspirational and not law in any sense. Others may comprise international commitments, but they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing" and is ratified on these terms. The law to this effect is longstanding. See Whitney v. Robertson, 124 U.S. 190, 194 (1888); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.).

The treaties in question here do not adopt any legal obligations binding as a matter of domestic law. The Universal Declaration of Human Rights is precatory: that is, it creates aspirational goals but not legal obligations, even as between states. Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2767 (2004). This is also true of the Inter-American Democratic Charter.[6] The

_____

[6]See Remarks of U.S. Ambassador Roger Noriega at Organization of American States Permanent Council Meeting (Sept. 6, 2001), in Digest of United States Practice in International Law: 2001 at 347, Office of the Legal Advisor, U.S. Department of State (Sally J. Cummins & David P. Stewart eds., 2001) ("[T]he United States understands that this Charter does not establish any new rights or obligations under either domestic or international law.").

-10-

final instrument, the International Covenant on Civil and Political Rights, is a ratified treaty but was submitted and ratified on the express condition that it would be "not self-executing." 138 Cong. Rec. S4781, S4784 (daily ed. Apr. 2, 1992). Indeed, Sosa used it as an example of such a treaty, saying:

> Several times, indeed, the Senate has expressly declined to give the federal courts the task of interpreting and applying international human rights law, as when its ratification of the International Covenant on Civil and Political Rights declared that the substantive provisions of the document were not self-executing.

124 S. Ct. at 2763.

Whatever limited room there may be for courts to second-guess the joint position of the President and the Senate that a treaty is not self-executing--and we are pretty skeptical of such a suggestion in light of "the discretion of the Legislative and Executive Branches in managing foreign affairs," id.--it is certainly not present in a case in which the Supreme Court has expressed its own understanding of a specific treaty in the terms block quoted above. Indeed, only a few pages later Sosa repeated: "[T]he United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." Id. at 2767.

When the President negotiates a precatory agreement or a non-self-executing treaty, and when Congress refuses to adopt

-11-

implementing legislation for a non-self-executing treaty, both are performing functions entrusted to them by the Constitution. U.S. Const. art. I, §§ 1, 8-10; art. II, §§ 2-3. It would ignore, and undermine, this constitutional allocation of functions for a federal court to declare that the United States was nevertheless "violating" such a treaty. In substance, such an exercise would attempt to do what the President and Congress have declined to do, namely, to deploy the treaty provision in an attempt to order domestic arrangements within the United States.

This intrusive course could also embarrass the United States in the conduct of its foreign affairs, which is "committed by the Constitution to the executive and legislative--'the political'--departments of the government." Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918). Whatever the State Department might later say, such a declaration by a federal court of a supposed "treaty obligation" could be trumpeted as propaganda in international bodies and elsewhere. This is a legitimate concern in considering whether "discretion" should be exercised to grant declaratory relief.[7] Of course, no such declaration would confer a presidential vote on Igartúa: it would merely reinforce

---

[7]See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 412, 431-33 (1964) (weighing possibility of "embarrassment to the Executive Branch in handling foreign affairs"); Baker v. Carr, 369 U.S. 186, 217 (1962) ("potentiality of embarrassment from multifarious pronouncements by various departments on one question" relevant to justiciability). See also United States v. Lee, 106 U.S. 196, 209 (1882).

the disturbing view that judges have no proper notion of where their own authority ends.

The case for giving Puerto Ricans the right to vote in presidential elections is fundamentally a political one and must be made through political means. But the right claimed cannot be implemented by courts unless Puerto Rico becomes a state or until the Constitution is changed (as it has been, at least five times, to broaden the franchise). U.S. Const. amend. XV (race, color, previous servitude); id. amend. XIX (sex); id. amend. XXIII (District of Columbia); id. amend. XXIV (payment of poll or other tax); id. amend. XXVI (age eighteen and older). It certainly should not be "declared" by a federal court on the basis of treaties none of which was designed to alter domestic law--and none of which could override the Constitution.

Little need be said of Igartúa's related claim that customary international law, by itself and independent of treaties, requires that he be allowed to vote for President. Although sometimes said by enthusiasts to be law like other law, customary international law is a diffuse and often highly uncertain body of norms whose force and enforceability vary greatly even in the international sphere; and its status in our domestic courts is even more qualified. See Sosa, 124 S. Ct. at 2762-63, 2768-69.

Only recently, in Sosa, the Supreme Court enjoined great caution in importing such norms into domestic law, even in the

-13-

context of a federal statute governing alien tort actions that arguably authorized some degree of importation by federal courts. Sosa refused to recognize as a norm of customary international law the notion of protection against arbitrary arrest. 124 S. Ct. at 2769. Yet the claim rejected in Sosa was a model of precision compared to Igartúa's present claim.

No serious argument exists that customary international law, independent of the treaties now invoked, requires a particular form of representative government. Practice among leading democratic nations shows a diversity as to how governments organize and structure the franchise; in Great Britain, for example, neither the head of state nor of government is directly elected by the public at large. If there exists an international norm of democratic government, it is at a level of generality so high as to be unsuitable for importation into domestic law. Sosa, 124 S. Ct. at 2768 n.27.

Finally, other supporters of Igartúa's claim suggest that the United States need not "amend the Constitution" to resolve the asserted infirmity of having Puerto Ricans classed as citizens of the United States but unable to vote for President. For example, Puerto Rico could be made a state or, alternatively, could be recognized as an independent nation. Granting the declaration, it is claimed, would encourage the United States to "take steps"

toward a resolution even if it did not immediately secure a vote for Igartúa.

This is, of course, nothing but speculation, but it further underscores the impropriety of the judicial declaration sought. The main impact of such an abstract declaration, if any, would be to serve partisans in a political campaign as to the choice between statehood, independence, Commonwealth status, or other altered arrangements between Puerto Rico and the United States. Changes to the Constitution and the present status of Puerto Rico are not the province of federal judges, nor are they dictated by international law; those changes can only be adopted as set forth in the Constitution and laws of the United States.

Affirmed.

**Concurring and dissenting opinions follow.**

**CAMPBELL, <u>Senior Circuit Judge</u>, concurring.** I join in Chief Judge Boudin's excellent opinion for the majority, but I also note my subscription to Judge Lipez's narrower concurrence. The two are not in conflict. The majority's opinion recognizes the possible validity of Judge Lipez's belief that the court here lacks jurisdiction to grant declaratory relief. I happen to think Judge Lipez is right, and, if so, that of course ends the matter. But even apart from the correctness of his approach, I agree with Chief Judge Boudin's alternative analysis which leads to the same outcome.

**LIPEZ, Circuit Judge, concurring in the judgment.** I agree with the majority's denial of relief to Igartúa. I write separately, however, because I would reject Igartúa's request for declaratory relief on jurisdictional grounds.

## I.

I am sympathetic to the aspirations of Puerto Ricans who are citizen residents of Puerto Rico to participate fully in the election of the President and Vice President of the United States. The dissenting judges present their legal positions in support of those aspirations powerfully and eloquently. Nevertheless, "[f]ederal courts are courts of limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and that limited jurisdiction does not permit us to decide the issues raised by Igartúa's request for declaratory relief.

It may seem odd to some that a federal court might not have the power to answer important legal questions involving the interaction between the Constitution, international law, and the rights of American citizens. But, as I will explain below, one cannot simply go to federal court and get an answer to a legal question. Before a federal court can resolve the issues before it, the court must first satisfy itself that, if the plaintiff ultimately won, the decision would probably result in a redress of the plaintiff's grievance. If a judicial victory would probably not produce such a result, the federal court has no power to

-17-

address the merits of the issues underlying the dispute. In most cases redressability is not a problem. In this case, however, redressability is an insuperable problem.

As the majority ably explains, there are only two methods under our Constitution by which a territory can receive electoral votes: through admission as a state, see U.S. Const. art. IV, § 3, cl. 1, or by special amendment, see id. amend. XXIII. For all practical purposes, only Congress can perform either of these actions, and whether to do so is in Congress's sole discretion.[8] Thus, the critical jurisdictional question reduces to whether a court can declare Congress's failure to initiate either of these processes to be a violation of international law -- or, as Judge Torruella puts it, whether a court can issue a declaratory judgment that "the United States has taken no steps to meet its obligations under the ICCPR and customary international law to grant equal voting rights to all citizens in the election of the President and Vice President of the United States." Post at 88 (Torruella, J., dissenting).

In my view, the answer to this jurisdictional question does not turn on the precise contents of the particular agreements at issue; whether the agreements are binding or merely "precatory";

---

[8]There is an exception, in theory: if two-thirds of state legislatures so request, Congress must convene a Constitutional convention. See U.S. Const. art. V. However, no such convention has ever been convened since the adoption of the Constitution.

whether they have been ratified by the Senate; whether they are self-executing; or even whether the relevant international legal norms derive from agreements at all, as opposed to customary law. Nor does the answer turn on the discretionary nature of a declaratory judgment. Even if those factors were removed, Igartúa's request for declaratory relief would still face an insuperable obstacle: we lack jurisdiction to decide his international law claim because his grievance is not judicially redressable. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998) (court must address Article III jurisdictional questions before addressing merits, because "[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment -- which comes to the same thing as an advisory opinion"). Unavoidably, Igartúa's request for a declaratory judgment requires unsupportable speculation about the possibility of a Constitutional amendment or the admission of Puerto Rico as a state. For this reason alone, I conclude that we do not have jurisdiction over his request for declaratory relief.

## II.

Under Article III of the Constitution, "[t]he judicial Power shall extend" to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The Supreme Court has interpreted this "case or controversy" requirement to mean, among other things, that federal courts do not issue advisory opinions. In particular, a

federal court may only exercise jurisdiction over an action if it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38, 43 (1976)). If the plaintiff cannot show that his injury "is likely to be redressed by a favorable decision," the federal court's "exercise of its power . . . would be gratuitous and thus inconsistent with the Art. III limitation." Simon, 426 U.S. at 38. This limitation applies with undiminished force to actions for declaratory judgment. See Calderon v. Ashmus, 523 U.S. 740, 745 (1998) ("[W]e must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited."); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937) (The Declaratory Judgment Act "is operative only in respect to controversies which are such in the constitutional sense.").

This is not a case where a plaintiff claims injury from an allegedly unconstitutional act of Congress. Rather, Igartúa claims injury from Congress's inaction in the face of certain international agreements: its failure to either admit Puerto Rico as a state or to propose a Constitutional amendment allocating electors to Puerto Rico.[9] Since it is beyond dispute that we could

_____

[9]The dissents suggest that there might be other alternatives by which Congress could grant the Presidential vote to residents of Puerto Rico. The only specific suggestion is one first advanced by Judge Leval in Romeu v. Cohen, 265 F.3d 118, 128-30 (2d Cir. 2001)

-20-

not order Congress to do either of those things, Judge Torruella says that we should issue a declaratory judgment that Congress has not fulfilled its duties under international agreements.  Judge Torruella then says that Congress, chastened by this declaration, would voluntarily choose to act -- presumably either by admitting Puerto Rico as a state or proposing an amendment similar to the Twenty-third.  In Judge Torruella's view, "it is substantially likely that a declaration by this Court that the United States is in violation of international law will result in some form of relief to the United States citizens who reside in Puerto Rico." Post at 80 (Torruella, J., dissenting).

Respectfully, the basis for this speculation about Congress initiating the process of Constitutional amendment or invoking the Constitutional process for the admission of a new state is unexplained.  We have already warned about the hazards of such speculation when only statutory changes by a state legislature were at stake.  In Biszko v. RIHT Financial Corp., 758 F.2d 769

_____

(Leval, J., writing separately), under which Congress would require each state to accept a proportional share of territorial voters. See post at 89 (Howard, J., dissenting).  This suggestion has been critiqued on the ground that there is "no authority in the Constitution for the Congress (even with the states' consent) to enact such a provision."  Romeu, 265 F.3d at 121 (Walker, Jr., C.J., concurring); see also id. at 136 (Walker, Jr., C.J., concurring) ("I see only two remedies afforded by the Constitution: (1) statehood . . ., or (2) a constitutional amendment.").  At any rate, for purposes of redressability analysis, it is no more likely that Congress would adopt Judge Leval's suggestion (which is probably not Constitutionally permissible) than one of the two alternatives that the Constitution provides.

-21-

(1st Cir. 1985), plaintiffs challenged a Rhode Island statute that arguably created market conditions under which plaintiffs could not receive full market value for their shares in a Rhode Island bank.[10] They argued that their suit was redressable because if the federal court invalidated the statute, "the Rhode Island legislature would soon be moved, sua sponte or by the persuasive efforts of non-New England banks, to pass a statute permitting [a more competitive market]." Id. at 773. We described such speculation concerning "a benefit that [plaintiffs] might gain were the Rhode Island legislature to react in a certain way to a decision by this court" as "not merely speculative" but "positively chimerical." Id.[11]

If a legislative body would be within its rights to ignore the court's decision, and the plaintiff cannot convince the court that it is "'likely,' as opposed to merely 'speculative,'" Lujan, 504 U.S. at 561, that the legislature will react in the way that he hopes, the redressability requirement has not been met. Cf. Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948) ("[I]f the President may completely disregard the

---

[10]The statute permitted a Rhode Island bank to be acquired by an out-of-state bank, but only if the other bank was based in another New England state. The plaintiffs were shareholders of a Rhode Island bank that had agreed to merge with a Massachusetts bank, and they sought to block the merger. See id. at 770-71. They argued that the limitation to New England banks reduced competition and that, without that restriction, an out-of-state bank would have had to pay more for their stock. See id. at 771.

[11]We analyzed this argument under the rubric of the "injury" requirement, but our reasoning on that point applies to the redressability requirement.

-22-

judgment of the court, it would be only because it is one the courts were not authorized to render. Judgments, within the powers vested in courts by the Judiciary Article of the Constitution, may not lawfully be revised, overturned or refused faith and credit by another Department of Government."). The cases that Judge Torruella cites for the contrary proposition (that Congress would be "substantially likely" to redress Igartúa's grievance in light of a judicial declaration) are easily distinguishable and actually reveal why the redressability requirement prevents declaratory relief here.

Judge Torruella relies on Utah v. Evans, 536 U.S. 452 (2002), a dispute ultimately stemming from the Census Bureau's method of calculating population in the 2000 census. The Bureau used a statistical method that calculated the population of Utah as somewhat lower, relative to the population of North Carolina, than if the Bureau had not used that method. See id. at 457-58. Pursuant to statute, the Bureau's final report was formally transmitted to Congress, and the Clerk of the House of Representatives then transmitted to each state governor "'a certificate of the number of Representatives to which [that] State [was] entitled.'" Id. at 461 (quoting 2 U.S.C. § 2a(b)). Due to the statistical method that the Bureau used, Utah received one less representative, and North Carolina one more representative, than if the Bureau had not used that method. Id. at 458. After receiving

-23-

the results, Utah sued the government, arguing that the Bureau's statistical method violated another census-related statute, and sought an injunction ordering the Bureau to reissue its report with different results.  Id. at 459.

North Carolina intervened, arguing that the case was not justiciable because the relief sought would not redress Utah's grievance.  Although North Carolina "[did] not deny that the courts [could] order the [Bureau] to recalculate the numbers and to recertify the official census result," it reasoned that "Utah suffer[ed], not simply from the lack of a proper census 'report' (a document), but more importantly from the lack of the additional congressional Representative to which North Carolina believes itself entitled as a consequence of the filing of that document." Id. at 461.  In other words, although the court could order a new census report as Utah requested, a new report would not result in Utah gaining a Representative.  That outcome would depend entirely on whether Congress, acting in its unbridled discretion, would choose to reapportion, or just ignore the report.

The Court concluded that the injury cited by Utah was redressable:

> [W]e believe it likely that Utah's victory here would bring about the ultimate relief that Utah seeks. Victory would mean a declaration leading, or an injunction requiring, the Secretary to substitute a new "report" for the old one.  Should the new report contain a different conclusion about the relative populations of North Carolina and

Utah, the relevant calculations and consequent apportionment-related steps would be purely mechanical; and several months would remain prior to the first post-2000 census congressional election. Under these circumstances, it would seem . . . "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute . . . ."

Id. at 463-64 (quoting Franklin v. Massachusetts, 505 U.S. 788, 803 (1992) (opinion of O'Connor, J.)). Two points about Evans bear emphasis. First, compliance with the actual court order or declaration relating to the need for a new census report "would be purely mechanical." 536 U.S. at 463. Second, while ultimate redress of Utah's grievance would require discretionary action by elected officials, that action -- recertifying the total number of Representatives for two states -- was of a piece with a process so regular and commonplace that Congress has, in ordinary circumstances, delegated it by statute to the Clerk of the House.[12] Here, by contrast, the Congressional action envisioned (admitting a state or initiating the process of Constitutional amendment) is exceptional, lengthy, complex, and highly uncertain. Consequently,

---

[12]After Congress receives the statement listing the number of representatives to which each state is entitled, "[i]t shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled." 2 U.S.C. § 2a(b).

how Congress would react to a declaration is considerably more speculative here than in Evans.[13]

A second case cited by Judge Torruella, Juda v. United States, 13 Cl. Ct. 667 (1987), relates more directly to international agreements. Juda concerned the status of the Marshall Islands. After World War II, the United States entered into an agreement with the United Nations (UN) to administer the Marshall Islands as a UN trusteeship, in an arrangement designed to be temporary. In the 1970s, the United States decided to terminate the trusteeship and offer the territory a compact of free association. The compact agreement was submitted to a plebiscite, and was resoundingly approved. Congress then enacted, and the President signed, legislation formally adopting the compact. After the President issued an executive order implementing the compact, the UN Trusteeship Council determined that the trusteeship had terminated. See id. at 671-76.

Some years later, Marshall Islander plaintiffs filed a claim against the United States under the Tucker Act, 28 U.S.C. § 1491,[14] which had undisputedly applied to the Islands while they were still under the trusteeship. The United States argued,

_____

[13]Moreover, one of the two methods of redress contemplated -- Constitutional amendment -- would require action not just by Congress, but also the legislatures of thirty-eight states. See U.S. Const. art. V.

[14]The Tucker Act grants jurisdiction to the Court of Federal Claims (then known as the Claims Court) for claims against the United States, and provides the government's consent to such suits.

-26-

however, that the compact agreement withdrew the government's waiver of sovereign immunity. See 13 Cl. Ct. at 677. The plaintiffs responded that, under the rules applicable to UN trusteeships, the trusteeship had not been validly terminated, and therefore the compact -- which withdrew the government's consent to suit -- never took effect. See id. at 678.

The court rejected the plaintiffs' argument that failure to terminate the trusteeship properly meant that the compact (and with it the withdrawal of consent to suit) had never taken effect. Rather, the court found that whether "the Trusteeship Agreement has not been terminated de jure does not resolve the issue of whether the Compact . . . is in effect." Id. at 682. Ultimately, the court concluded that the compact did take effect, and therefore that the United States had withdrawn its consent to be sued. See id. at 683, 690. Thus, it dismissed the complaint. Id. at 690.

Nevertheless, in a lengthy dictum, the court explained that the trusteeship had in fact not been properly terminated. The court held that the trusteeship could not be formally terminated until the UN Security Council so voted. See id. at 678-82. Some time after the Juda decision issued, the government took the court's advice and formally asked the Security Council to terminate the trusteeship, which it did. See United Nations Security Council Resolution 683 (Dec. 22, 1990). That dictum, and the government's

decision to take the court's advice, is the precedent upon which Judge Torruella relies.

Yet the Juda court did not "declare" anything -- it dismissed the plaintiffs' complaint, did not even mention a declaratory judgment, and is cited by Judge Torruella only for a dictum. More importantly, in Juda there was no dispute that both Congress and the President intended to terminate the trusteeship; indeed, by enacting the compact and issuing an executive order implementing it, the political branches thought they had done exactly that. Juda noted that these actions did not have their intended effect due to a technical misunderstanding of UN procedures, and explained how the elected branches could properly achieve what they had already sought to do. The likelihood that Congress and the President would follow the court's advice was not just "substantial," it was a near certainty. There is nothing remotely approaching such certainty here.[15]

---

[15]A third case cited by Judge Torruella, Federal Election Commission v. Akins, 524 U.S. 11 (1998), does not involve the likelihood of action by Congress. Akins was a petition for review of an administrative agency's dismissal of an administrative complaint. See id. at 18. The agency's governing statute specifically authorized judicial review of an agency's decision not to take certain action, see 2 U.S.C. § 437g(a)(8)(A), and provided that the district court "may declare that the dismissal of [a] complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days," id. § 437g(a)(8)(C). Thus, Akins involved an administrative agency which Congress placed under unusually close judicial oversight, even extending to the agency's exercise of prosecutorial discretion, for which every declaration was potentially accompanied by a coercive order "to conform with such declaration within 30 days." We are not dealing in this case with a subordinate

There is no precedent for issuing a declaratory judgment in the circumstances of this case, and for good reason.  A declaratory judgment "is a procedural device that provides a new, noncoercive remedy . . . in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy . . . and in cases in which a party <u>who could sue for coercive relief</u> has not yet done so."  <u>B. Braun Med., Inc.</u> v. <u>Abbott Labs.</u>, 124 F.3d 1419, 1428 (Fed. Cir. 1997) (emphasis added).  Here, however, no coercive remedy would <u>ever</u> be available.  Congress would be perfectly within its rights to ignore whatever a federal court said.  The court's declaratory judgment would be, in essence, an advisory opinion.

As the Supreme Court explained in a different context:

> In all civil litigation, the judicial decree is not the end but the means.  At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces -- the payment of damages, or some specific performance, or the termination of some conduct.  Redress is sought <u>through</u> the court, but <u>from</u> the defendant.  This is no less true of a declaratory judgment suit than of any

government agency, created by statute, with carefully crafted provisions for substantive judicial review over the agency's decision to do nothing.  Rather, the party whose inaction Igartúa complains of is Congress itself, a coequal branch of government that is Constitutionally free to ignore any potential declaration that it should or must perform various actions entrusted to its sole discretion by the Constitution itself.  The redressability analysis in <u>Akins</u> does not apply to this case.

-29-

> other action. The real value of the judicial pronouncement -- what makes it a proper judicial resolution of a "case or controversy" rather than an advisory opinion -- is in the settling of some dispute <u>which affects the behavior of the defendant towards the plaintiff</u>.

<u>Hewitt</u> v. <u>Helms</u>, 482 U.S. 755, 761 (1987) (describing test for "prevailing party" under 42 U.S.C. § 1988).  Here there is only hope and speculation that Congress, in response to a declaratory judgment about a violation of international law, would invoke cumbersome and contentious processes relating to Constitutional amendments or the admission of a new state to eventually give citizen residents of Puerto Rico the right to vote for President and Vice President.  Such hope and speculation does not satisfy the "case or controversy" requirement of Article III.  On that basis alone, I would decline to exercise jurisdiction over Igartúa's request for declaratory relief.

**TORRUELLA**, <u>Circuit Judge</u> **(dissenting)**.[16]  In its haste to "put [plaintiffs-appellants'] constitutional claim fully at rest,"[17] <u>maj. op.</u> at 6, the majority has chosen to overlook the issues actually before this en banc court as framed by the order of the rehearing panel, <u>see</u> <u>Igartúa de la Rosa</u> v. <u>United States</u>, 404 F.3d 1 (1st Cir. 2005) (order granting panel rehearing), which panel the en banc court suppressed, but whose order was adopted as establishing the  parameters of the issues to be decided by the en banc court.  <u>See</u> <u>Igartúa de la Rosa</u> v. <u>United States</u>, 407 F.3d 30, 31 (1st Cir. 2005) (converting to en banc review panel rehearing in which "the parties [are] to address two issues:  first, the plaintiffs' claim that the United States was in default of its treaty obligations and, second, the availability of declaratory judgment concerning the government's compliance with any such

---

[16]I acknowledge the participation of amici, whose briefs contributed to the clarification of various important issues.  I regret that not all amici were granted the opportunity to express themselves at oral argument.

[17]Is this the constitutional equivalent of "rest in peace"? Of course, if Judge Lipez and Judge Campbell are correct that we lack jurisdiction to consider plaintiffs' claim, then the majority's various conclusions on the merits would be mere dicta, lacking any precedential value.  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." <u>Ex parte McCardle</u>, 7 Wall. 506, 514, 19 L.Ed. 264 (1868) (quoted in <u>Steel Co.</u> v. <u>Citizens for a Better Environment</u>, 523 U.S. 83, 94-95 (1998)).  Furthermore, if the concurring opinion is correct, the majority is issuing an advisory opinion of the same kind that Judge Lipez claims results from the declaratory judgment that I propose.

obligations."). It is these issues that the parties were asked to brief. Instead the majority has sidetracked this appeal into a dead end that is no longer before us:  Puerto Rico's lack of electoral college representation, see U.S. Const. art. II, § 1, cl. 2, and our lack of authority to order any constitutional change to such status by reason of that constitutional impediment.

In doing so, the majority fails to give any weight to the fundamental nature of the right to vote, and the legal consequences of this cardinal principal.  Under the combined guise of alleged political question doctrine, its admitted desire to avoid "embarrassment" to the United States, and its pious lecturing on what it deems to be the nature of the judicial function, the majority seeks to avoid what I believe is its paramount duty over and above these stated goals:  to do justice to the civil rights of the four million United States citizens who reside in Puerto Rico. The majority labels this duty with despect as "rhetoric" and "intuitive values."  Maj. op. at 3.  I beg to differ, and so, I suspect, do a considerable number of those four million U.S. citizens who, lacking any political recourse, look to the courts of the United States for succor because they are without any other avenue of relief.  See United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938) ("[P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be

-32-

relied upon to protect minorities and . . . may call for correspondingly more searching judicial inquiry.").[18]

Considering that justice and equity are the handmaidens of the law, I believe it is the duty of this court to exercise its equitable power under the Declaratory Judgment Act, 28 U.S.C. § 2201(a),[19] in its decision of the issues that are properly before the en banc court, and to declare that the United States has failed to take any steps to meet obligations that are cognizable as the supreme law of the land[20] regarding plaintiffs-appellants' voting rights. "This is of the very essence of judicial duty." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178 (1803).

Because I believe that the majority fails to meet this duty, I respectfully dissent.

---

[18]Reducing the majority and concurring opinions to their bare bones, the former leaves the four million nationally disenfranchised United States citizens residing in Puerto Rico to claim their rights through a nonexistent political forum, while the latter deny an existing judicial forum the authority to state the actuality of an undeniable fact. Both outcomes leave the citizens in question in an unjust legal limbo.

[19]The Act states that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

[20] U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

**I.**

**A. <u>How did we come to this state of affairs?</u>**

On July 25, 1898, in the closing days of the Spanish-American War, the United States invaded[21] Puerto Rico. At that

---

[21]In what must be the height of euphemism, the majority refers to this turn of events as Puerto Rico's becoming "associated" with the United States. <u>Maj. op.</u> at 4. A similar, but more pernicious, mischaracterization follows its description of the congressional enactments that authorized local self-government for Puerto Rico, which the majority calls an "agreement" for a "unique 'Commonwealth' status," <u>id.</u>, and which the majority states resulted in the current "<u>negotiated</u> relationship," <u>id.</u> at 9 (emphasis in original), between the U.S. and Puerto Rico. Of course, these statements are simply inaccurate and do not reflect the facts. There is no room for doubt that Public Law 600, 64 Stat. 319 (1950) (codified at 48 U.S.C § 731b, et seq.) (authorizing Puerto Rico to enact a constitution for local self-government), and its sequel, Public Law 447, 66 Stat. 327 (1952) (resolution approving Puerto Rico's Constitution), did nothing to change the underlying constitutional status of Puerto Rico as an unincorporated territory, subordinated to Congress' plenary powers under the Territorial Clause, U.S. Const., Art. IV, § 3, cl. 2. <u>See generally</u> David M. Helfeld, <u>The Historical Prelude to the Constitution of the Commonwealth of Puerto Rico</u>, 21 Rev. Jur. U.P.R. 135 (1952); David M. Helfeld, <u>Congressional Intent and Attitude Toward Public Law 600 and The Constitution of</u> the Commonwealth of Puerto Rico, 21 Rev. Jur. 255 (1952) (containing numerous citations to the Congressional record and reports indicating that these measures did not change Puerto Rico's basic status under the Constitution nor Congress' powers over this unincorporated territory); Keith Bea, Congressional Research Service, <u>Political Status of Puerto Rico: Background, Options, and Issues in the 109th Congress</u>, at CRS-2 (updated Jun. 6, 2005) ("While the approval of the commonwealth constitution marked a historic change in the civil government for the islands, neither it, nor the public laws approved by Congress in 1950 and 1952, revoked statutory provisions concerning the legal relationship of Puerto Rico to the United States. This relationship is based on the Territorial Clause of the U.S. Constitution."). It is not just the majority's inaccuracies in describing the colonial relationship between Puerto Rico and the United States to which I object. The majority's unfortunate choice of language obviously favors the colonial condition and this bias will, without any question or doubt, be exploited politically.

point in time the inhabitants of Puerto Rico had full rights as Spanish citizens. This included the right to elect sixteen deputies and three senators, with full voting rights, to the Spanish <u>Cortes</u> (Parliament).[22] Fernando Bayrón Toro, <u>Elecciones y partidos de Puerto Rico</u> 108 (2003). Furthermore, Puerto Ricans had recently been granted a high measure of self-government. <u>See generally</u> Autonomic Charter of 1897, <u>reproduced at</u>, <u>Documents on the Constitutional Relationship of Puerto Rico and the United States</u> 22-46 (Marcos Ramirez Lavandero, ed., 1948).

All this came to naught with the signing of the Treaty of Paris on December 10, 1898, which officially concluded this "splendid little war"[23] and ended four hundred years of Spanish

---

The debate over what status Puerto Rico ought to have with respect to the United States is, of course, hotly contested. What that status should be is <u>not</u> the issue before us. The only issue is whether the U.S. citizens in Puerto Rico should have the right to vote nationally. The right to vote will benefit all U.S. citizens residing in Puerto Rico regardless of their position on status, since it will give them a meaningful political voice until that issue is resolved, and on that issue itself.

[22]In fact, Puerto Rico had been represented in the Spanish <u>Cortes</u> as early as 1812, <u>see</u> <u>Constitución politica de la Monarquía Española</u> (promulgated in Cadiz on Mar. 18, 1812), as a result of which its one deputy, Ramón Powers, became Vice President of the Cortes in 1812. Thereafter, depending on the vagaries of Spanish politics, constitutions, and special laws enacted to apply to Spain's overseas provinces and colonies, Puerto Rico was variously represented in the <u>Cortes</u>.

[23] John Hay, U.S. Ambassador to Great Britain in 1898, and a leading expansionist of the time, wrote to then Colonel Theodore Roosevelt, at the time of only Rough Rider fame, "[i]t has been a splendid little war; begun with the highest motives, carried on with magnificent intelligence and spirit, favored by that fortune which loves the brave." Frank Freidel, <u>The Splendid Little War</u> 3

colonial rule.  <u>See</u> Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.-Spain, 30 Stat. 1754.  Thus commenced, in its place, a new period of colonialism which has so far lasted one hundred and seven years.[24] Notwithstanding Puerto Ricans' loss of these major political grants from Spain, the transition to United States sovereignty was largely seamless.[25]  This was at least partially due to the fact that Spanish rule had been less than kind,[26] but more importantly, because of the prospect of joining a democratic nation that promised the Puerto Rican people that it had come to "bestow upon [Puerto Ricans] the immunities and blessings of [the] liberal institutions of our government."  Letter of Nelson Miles, Major-General Commanding the U.S. Army to the Inhabitants of Porto Rico (Nov. 5, 1898) <u>in</u> <u>Annual Reports of the War Department for the Fiscal Year Ended June 30, 1900</u> 19-20 (1902).  <u>See generally</u> Bailey W. Diffie & Justine Whitfield Diffie, <u>Porto Rico:  A Broken Pledge</u> (1931).

---

(1958); Hugh Thomas, <u>Cuba, The Pursuit of Freedom</u> 404 (1971).

   [24] <u>See generally</u> José Trías Monge, <u>Puerto Rico:  The Trials of the Oldest Colony in the World</u> (1997).

   [25] U.S. troops were received in Ponce, Puerto Rico's second largest city, by the municipal band playing the "Star Spangled Banner," and General Nelson Miles, commanding general of the expeditionary force wired Washington:  "Please send any national colors that can be spared, to be given to the different municipalities." 1 <u>Messages and Documents, 1898-1899</u>.

   [26] <u>See</u> Antonio Salvador Pedreira, <u>El Año Terrible del 87: Sus Antecedentes y Sus Consecuencias</u>, Ed. Edil, Rio Piedras (1974).

In fact, the Treaty of Paris left to future action by Congress what should be "[t]he civil rights and political status of the native inhabitants of the territories . . . ceded to the United States". Treaty of Peace, art. IX, para. 2, 30 Stat. 1754, 1759. Thus, for the first time in American history, the United States acquired territory without ipso facto granting its inhabitants citizenship,[27] and therefore, also contrary to its founding history, the United States became a colonial nation. See Julius William Pratt, America's Colonial Experiment 68 (1950). Immediately after the invasion, Puerto Rico settled into a military government that lasted until 1900, when Congress enacted the so-called Foraker Act. Foraker Act, ch. 191, 31 Stat. 77 (1900) (codified as amended in scattered sections of 48 U.S.C.). This statute established a civil government composed almost totally of officials appointed by the President. A local legislature was provided, but only its lower house was elected by Puerto Rican residents. The Foraker Act

---

[27] See Treaty Between the United States of America and the French Republic, April 30, 1803, U.S.-Fr. art. III, 8 Stat. 200, 202 (Louisiana Purchase); Treaty of Amity, Settlement, and Limits, Between the United States of America and His Catholic Majesty, Feb. 22, 1819, U.S.-Spain, art. 6, 8 Stat. 252 (acquisition of Florida); Treaty of Guadalupe Hidalgo, Feb. 2, 1848, U.S.-Mex., art. VIII, 9 Stat. 922 (acquisition of California); Gadsen Treaty, Dec. 30, 1853, U.S.-Mex., art. V, 10 Stat. 1031 (acquisition of Arizona); Treaty concerning the Cession of Alaska, Mar. 30, 1867, U.S.-Russ., art III, 15 Stat. 539 (acquisition of Alaska); Act of Apr. 30, 1900, ch. 1, § 4, cl. 339, 31 Stat. 141 (providing a government for Hawaii). Hawaii was actually annexed in 1898, see Joint Resolution To provide for annexing the Hawaiian Islands to the United States, 30 Stat. 750 (1898), two years before citizenship was granted.

declared these residents to be "citizens of Porto Rico."[28] Foraker Act § 7 ("[A]ll inhabitants continuing to reside [in Puerto Rico] who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United States . . . .")  As such, they became "nationals" of the United States.[29]  Almost immediately after the Foraker Act went into effect, a challenge was made to its provisions allowing the imposition of duties on goods imported into Puerto Rico from the United States.  It was claimed that this tax was contrary to the Uniformity Clause of Article I, Section 8 of the Constitution.

---

[28]Between 1900 and 1932, Puerto Rico was officially misspelled as "Porto Rico," as a result of the incorrect spelling of the Island's name in the English version of the Treaty of Paris in 1898.  This incorrect spelling was thereafter used in the Foraker Act in 1900, after which it took thirty-two years to persuade Congress that "Porto" is Portuguese and that the correct Spanish name should be restored. This was finally done by joint resolution on May 17, 1932.  Joint Resolution to change the name of "Porto Rico" to "Puerto Rico," ch. 190, 47 Stat. 158 (1932).

[29] A national, as distinguished from a citizen, who is "a member of a political community, owing allegiance to the community and being entitled to enjoy all its civil rights and protections," Black's Law Dictionary 261 (8th ed. 2004), is a person who owes allegiance to a state but does not enjoy the full rights of a citizen.  See José A. Cabranes, Citizenship and the American Empire, 127 U. Pa. L. Rev. 391 (1978); see also Gonzalez v. Williams, 192 U.S. 1, 12-13 (1904); cf. Dred Scott v. Sanford, 60 U.S. (19 How.) 393, 404 (1857) (holding that "a negro of African descent, [whose] ancestors were of pure African blood, and were brought into this country and sold as slaves," id. at 397, was not entitled to the privileges and immunities of the Constitution accorded to citizens).

U.S. Const., art. I, § 8, cl. 1 ("all Duties, Imposts, and Excises shall be uniform throughout the United States").

In the course of ruling upon this issue, the Supreme Court, in 1901, decided the Insular Cases,[30] wherein it sanctioned Puerto Rico's colonial status ad perpetuam.  There is no question that the Insular Cases are on par with the Court's infamous decision in Plessy v. Ferguson in licencing the downgrading of the rights of discrete minorities within the political hegemony of the United States.  See Plessy v. Ferguson, 163 U.S. 537 (1896) (holding that it was not a violation of the Equal Protection Clause for a state law to segregate white and colored people in public facilities provided "equal" alternatives were provided for each race); see also Rubin Francis Weston, Racism in U.S. Imperialism: The Influence of Racial Assumptions on American Foreign Policy, 1893-1946 15 (1972) ("Those who advocated overseas expansion faced this dilemma: What kind of relationship would the new peoples have to the body politic?  Was it to be the relationship of the Reconstruction period, an attempt at political equality for dissimilar races, or was it to be the Southern "counterrevolutionary" point of view which denied the basic

---

[30] De Lima v. Bidwell, 182 U.S. 1 (1901); Goetze v. United States, 182 U.S. 221 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Huus v. New York & Porto Rico Steamship Co., 182 U.S. 392 (1901).  See generally Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1985).

American constitutional rights to people of color?  The actions of the federal government during the imperial period and the relation of the Negro to a status of second-class citizenship indicated that the Southern point of view would prevail.  The racism which caused the relegation of the Negro to a status of inferiority was to be applied to the overseas possessions of the United States.")

The Insular Cases, would today be labeled blatant "judicial activism."[31]  See, e.g., Keenan D. Kmiec, The Origin and Current Meanings of "Judicial Activism", Comment, 92 Cal. L. Rev. 1441, 1463-76 (2004) (describing judicial practices purported to be indicative of judicial activism).  They are anchored on theories of dubious legal or historical validity, contrived by academics interested in promoting an expansionist agenda.[32]  These theories

_____

[31]As Finely Peter Dunne, a popular political wit of the time said about the Insular Cases, "[n]o matter whether th' constitution follows th' flag or not, th' supreme court follows th' ilection results."  Finley Peter Dunne, Mr. Dooley's Opinions 26 (1901). Whether the Constitution applied in the territories acquired as a result of the Spanish-American War was, of course, central to the Insular Cases, and a major issue in the 1900 elections, which were won by McKinley and those who favored overseas territorial expansion without extension of the Constitution.  See La Feber, "The Elections of 1900," in 3 History of American Presidential Elections, 1789-1968 1877 (Arthur M. Schlesinger, Jr. ed., 1971).

[32] See, e.g., Selden Bacon, Territory and the Constitution, 10 Yale L.J. 99 (1901); William W. Howe, The Law of Our New Possessions, 9 Yale L.J. 379 (1900); Charles C. Langdell, The Status of Our New Territories, 12 Harv. L. Rev. 365 (1899); Carman F. Randolph, Constitutional Aspects of Annexation, 12 Harv. L. Rev. 291 (1898); James Bradley Thayer, Our New Possessions, 12 Harv. L. Rev. 464, 467 (1899) ("Let me at once and shortly say that, in my judgment, there is no lack of power in our nation -- of legal, constitutional power, to govern these islands as colonies, substantially as England might govern them . . . ."); cf. Simeon E.

in turn provided a platform that allowed a receptive bare plurality of Justices[33] to reach a result unprecedented in American jurisprudence and unsupported by the text of the Constitution. See generally James E. Kerr, The Insular Cases:  The Role of the Judiciary in American Expansionism (1982).

In fact, what precedent existed was contrary to the premise underlying the Insular Cases, for in Dred Scott, Chief Justice Taney had concluded:

> There is certainly no power given by the Constitution to the Federal Government to establish or maintain colonies bordering on the United States or at a distance, to be ruled and governed at its own pleasure . . . . [N]o power is given to acquire a Territory to be held and governed permanently in that character.

Dred Scott v. Sanford, 60 U.S. (19 How.) at 446.

This conclusion, however, presented no obstacle to Justice Brown, who wrote the opinion of the Court in Downes v. Bidwell, the leading Insular Case:

> We are also of opinion that the power to acquire territories by treaty implies, not

---

Baldwin, The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory, 12 Harv. L. Rev. 393 (1899).  See generally Frederic R. Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Colum. L. Rev. 823 (1926).

[33] In Downes, 182 U.S. 244, Justice Brown delivered the judgment of the court.  Justice White delivered a concurring opinion joined by Justices Shirra and McKenna.  Justice Gray also delivered a concurring opinion.  Chief Justice Fuller dissented, with Justices Harlan, Brewer and Peckham joining.  Justice Harlan also filed a separate dissent.

-41-

only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the "American Empire."

Downes, 182 U.S. at 279.

Justice Brown goes on to say, in language that is tinged by Plessy-like views:

It is obvious that in the annexation of outlying and distant possessions grave questions will arise from differences of race, habits, laws and customs of the people . . . which may require action on the part of Congress that would be quite unnecessary in the annexation of contiguous territory inhabited only by people of the same race, or by scattered bodies of native Indians.

Id. at 282. He concluded that:

A false step at this time might be fatal to what Chief Justice Marshall called the American Empire . . . . If those possessions are inhabited by alien races, differing from us in religion, customs, laws, methods of taxation, and modes of thought, the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible; and the question at once arises whether large concessions ought not to be made for a time, that ultimately our own theories may be carried out . . . . We decline to hold that there is anything in the Constitution to forbid such action. We are therefore of the opinion that the Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States within the revenue clauses of the Constitution . . . .

Id. at 286-87.

Justice White's concurrence in Downes provided the central support for the seminal "unincorporated territory" doctrine for which the Insular Cases have become known. This doctrine states that in the case of unincorporated territories -- that is, those for which, at the time of acquisition, the United States did not express an intention of incorporating into the Union -- only those parts of the Constitution dealing with "fundamental" rights apply. See Coudert, supra, note 32, at 832 (relating a conversation with Justice White in which it was "evident that he was much preoccupied by the danger of racial and social questions of a very perplexing character and that he was quite as desirous as Justice Brown that Congress should have a very free hand in dealing with the new subject populations").

Chief Justice Fuller's dissent, which was joined by Justices Harlan, Brewer and Peckham, and thus gathered the most votes, followed a strict construction of the Constitution. It rejected the plurality's conclusion as inconsistent with the Constitution, because it

> assumes that the Constitution created a government empowered to acquire countries throughout the world, to be governed by different rules than those obtaining in the original states and territories, and substitutes for the present system of republican government a system of domination over distant provinces in the exercise of unrestricted power.

Downes, 182 U.S. at 373 (Fuller, C.J., dissenting).

Justice Harlan's dissent was equally forceful in pointing

out that:

> Still less is it true that Congress can deal
> with new territories just as other nations
> have done or may do with their new territories
> . . . . Monarchical and despotic governments,
> unrestrained by written constitutions, may do
> with newly acquired territories what this
> government may not do consistently with our
> fundamental law.  To say otherwise is to
> concede that Congress may, by action taken
> outside of the Constitution, engraft upon our
> republican institutions a colonial system such
> as exists under monarchical governments.
> Surely such a result was never contemplated by
> the fathers of the Constitution . . . .  The
> idea that this country may acquire territories
> anywhere upon the earth, by conquest or
> treaty, and hold them as mere colonies or
> provinces,--the people inhabiting them to
> enjoy only such rights as Congress chooses to
> accord to them,-- is wholly inconsistent with
> the spirit and genius, as well as with the
> words, of the Constitution.

Id. at 380.  Justice Harlan went on to say, in part to answer the

racial overtones of the plurality, that:

> Whether a particular race will or will not
> assimilate with our people, and whether they
> can or cannot with safety to our institutions
> be brought within the operation of the
> Constitution, is a matter to be thought of
> when it is proposed to acquire their territory
> by treaty.  A mistake in the acquisition of
> territory, although such acquisition seemed at
> the time to be necessary, cannot be made the
> ground for violating the Constitution or
> refusing to give full effect to its
> provisions.  The Constitution is not to be
> obeyed or disobeyed as the circumstances of a
> particular crisis in our history may suggest
> the one or the other course to be pursued . .

> . . The Constitution is supreme over every
> foot of territory, wherever situated, under
> the jurisdiction of the United States, and its
> full operation cannot be stayed by any branch
> of the government in order to meet what some
> may suppose to be extraordinary emergencies.
> If the Constitution is in force in any
> territory, it is in force there for every
> purpose embraced by the objects for which the
> government was ordained.

Id. at 384-85.

Although decided by an exiguous plurality of five votes to four, and based on dubious constitutional foundations, the Insular Cases became an article of faith in American constitutional dogma, with far-reaching consequences on the lives of the millions of persons whom they impacted in very fundamental ways.  See Torruella, supra note 30, at 117-266.

B. **United States citizenship for the residents of Puerto Rico**

In the aftermath of the Insular Cases, the United States settled into the business of governing its far-flung colonial empire and emerged from its isolationist cocoon into the world of power politics.  See generally Foster Dulles, America's Rise to World Power, 1898-1954 (1955).  In the meantime, between 1901 and 1917, a total of twenty one bills were presented in Congress proposing the grant of U.S. citizenship to Puerto Rico's inhabitants.[34]  During this interregnum between the Insular Cases and the 1917 passage of the Jones Act, ch. 145, 39 Stat. 951 (1917)

---

[34] For a full account see Cabranes, supra note 29.

-- which granted U.S. citizenship to the residents of Puerto Rico,
id. § 5 -- the Supreme Court decided Rassmussen v. United States,
197 U.S. 516 (1905). Rassmussen provides an important backdrop to
the grant of citizenship to Puerto Ricans because in it, the
Supreme Court seemed to link the incorporation of a territory into
the United States (and thus full application of the Constitution)
to the granting of citizenship to the inhabitants of a territory.
See id. at 522 (finding grant of citizenship to residents of newly
acquired territory of Alaska served "to express the purpose to
incorporate acquired territory into the United States.").

There was therefore great expectation in Puerto Rico when
Congress passed the Jones Act in 1917, which, in addition to
providing Puerto Ricans with an elected bicameral legislature,
granted U.S. citizenship to the residents of Puerto Rico.[35] These
hopes were soon deflated by the Supreme Court in Balzac v. Porto
Rico, 258 U.S. 298 (1922), in which Chief Justice William Howard
Taft,[36] at this point writing for a unanimous court, held that no

---

[35] For an in-depth account of the events leading up to the
passage of the Jones Act, particularly the acrimonious debates that
preceded its passage, see Cabranes, supra note 29, at 471-85.

[36] Chief Justice Taft who, of course, had been President of the
United States from 1909 to 1912, had a long and somewhat fractious
experience with the United States' newly acquired colonies. He did
not need to be influenced by academics on questions of expansionism
or how to deal with the colonies. In 1900, he became the first
civilian governor of the Philippine Islands at a time when the
Aguinaldo Insurrection -- a war that led to thousands of U.S.
casualties and over 100,000 civilian deaths, many more than in the
entire Spanish-American War -- was in full swing. See generally
Brian McAllister Linn, The Philippine War, 1899-1902 (2000). In

right to trial by jury attached to Balzac's new status as a U.S. citizen because, even after the Jones Act, Puerto Rico remained an unincorporated territory with only "fundamental rights" under the Constitution applying. The right to trial by jury was not, the Court reaffirmed, "a fundamental right." Id. at 309-10 (quoting Dorr v. United States, 195 U.S. 138, 148 (1904). Contra Duncan v. Louisiana, 391 U.S. 145, 154 (1968) (holding that trial by jury is a fundamental right).

What rights did U.S. citizenship give Puerto Ricans? "It enabled them to move into the continental United States," and upon becoming residents thereof, to enjoy the rights of other citizens. Balzac, 258 U.S. at 308. It was locality that counted, said Chief Justice Taft, "not the status of the people who live in it." Id. at 309. In language reminiscent of the racially-tinged asseverations of Justice Brown in Downes, Chief Justice Taft went on to say:

_____

1904, while Secretary of War under President Theodore Roosevelt, Taft oversaw not only the Philippines, but also Cuba and Puerto Rico. In 1906, he was sent to Cuba as its provisional governor under the Platt Amendment to the Cuban Constitution, which allowed the United States to intervene in Cuban affairs during times of "unrest." However, it was during his time as President that Taft became openly disenchanted with Puerto Rico and its inhabitants as a result of the so-called Budget Crisis of 1909. See Truman R. Clark, President Taft and the Puerto Rican Appropriations Crisis of 1909, 26 The Americas 152-70 (1969). President Taft accused Puerto Rico's elected leaders of irresponsibility and political immaturity, and suggested that too much power had been given to Puerto Ricans "for their own good." Message from President Taft to Congress, S. Rep. No. 61-10, at 5. See generally Henry F. Pringle, The Life and Times of William Howard Taft (1939).

The jury system postulates a conscious duty of participation in the machinery of justice which it is hard for people not brought up in fundamentally popular government at once to acquire . . . . Congress has thought that a people like the Filipinos, or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and political conceptions, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin, and when.

Id., at 310.

Rassmussen was distinguished:

It is true that in the absence of other and countervailing evidence, a law of Congress . . . declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens, may be properly interpreted to mean an incorporation of it into the Union, as in the case of Louisiana and Alaska. This was one of the chief grounds [for the holding in Rasmussen] . . . . But Alaska was a very different case from that of Porto Rico. It was an enormous territory, very sparsely settled, and offering opportunity for immigration and settlement by American citizens. It was on the American continent and within easy reach of the then United States. It involved none of the difficulties which incorporation of the Philippines and Porto Rico presents . . . .

Id. at 309 (internal citation omitted).

This is a prime example of the double standard that has been used by the Court, and concomitantly by Congress, in determining the rights to which the U.S. citizens of Puerto Rico are entitled. Unfortunately, it is one which has been repeated since Balzac was decided. See Califano v. Gautier Torres, 435 U.S.

1 (1978) (upholding Social Security Act provisions denying benefits to U.S. citizens who move to Puerto Rico); Harris v. Rosario, 446 U.S. 651 (1980) (upholding statute providing less federal financial assistance to Puerto Rico than other states to aid families with dependent children).

The Court's rulings in Kinsella v. Krueger, 351 U.S. 470 (1956), reh'd granted 352 U.S. 901 (1956), and Reid v. Covert, 351 U.S. 487 (1956), reh'd granted, 352 U.S. 901 (1956), illustrate this point even more clearly. Although, in denying Puerto Ricans the right to trial by jury in Balzac, Chief Justice Taft unequivocally stated that "[i]t is locality that is determinative of the application of the Constitution in such matters as judicial procedure, and not the status of the people who live in it," 258 U.S. at 309, the Supreme Court nevertheless chose to overlook this rule when deciding Kinsella and Reid in the aftermath of the Second World War.

Both cases involved challenges to the application of the Uniform Code of Military Justice to women who were tried, convicted and sentenced by court martial for murdering their serviceman husbands, one in Japan (Kinsella), and the other in England (Reid). Neither had the benefit of indictment by grand jury or trial before a petit jury. On the first round, the Court, relying on Balzac, affirmed the validity of both convictions. Kinsella, 351 U.S. at

474-80; Reid, 351 U.S. at 490-91 (relying on Kinsella as establishing validity of military jurisdiction).

This outcome was followed by much public stirring, an unsurprising result, considering the number of civilian U.S. citizens who were then attached to the military overseas. The public outcry undoubtedly contributed to their being reheard almost immediately, early in the Court's next term.

The plurality opinion, reversing the prior outcome, was written by Justice Black. He announced that the reliance placed on the Insular Cases in the first Kinsella opinion was "misplaced." Reid v. Covert, 354 U.S. 1, 13 (1957). In language reminiscent of Justice Harlan's dissents in the Insular Cases, Justice Black stated:

> The 'Insular Cases' can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship . . . . The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government.

Id. at 14 (emphasis added).

The new outcome in Kinsella and Reid, as well as the reversal of Plessy by Brown v. Board of Education, 347 U.S. 483

(1954), accentuate the realpolitik of the civil and political rights of the United States citizens who reside in Puerto Rico, for it is because of the democratic deficit in the Puerto Rico-United States relationship that Puerto Rico enters its second century of its colonial condition with the United States without any resolution of this conundrum in sight.[37] Stagnation is inevitable, for there is a political vacuum in the Puerto Rico-United States linkage. No effective political pressure can be exercised by the subjects of this colonial relationship on the national political institutions with power to solve the problem. It is precisely because this discrete population of United States citizens is kept in a voteless state by the national political institutions that have "plenary powers" over Puerto Rico that a "political solution" is not a realistic option. The opinion of U.S. voters affected by Kinsella and Reid could be heard and felt in Washington, as could that of African-Americans after Plessy, even if they were a numerical minority, because they had a significant political presence that was bound to be listened to sooner or later. There can be little doubt that this political clout was transformed into a judicial result. Cf. supra note 31. Not so with Puerto Rico's U.S. citizens. They have no effective way of influencing the

---

[37]The debate over what status Puerto Rico ought to have with respect to the United States is, of course, hotly contested. The right to vote will benefit all U.S. citizens residing in Puerto Rico, regardless of their position on status since it will give them a meaningful political voice until that issue is resolved.

political branches of the national government. Puerto Rico's lone non-voting representative in Congress is a prime example of Puerto Rico's political defenselessness. The political pressure that can be exercised by those who took Chief Justice Taft's advice, and moved to the Mainland, is so diluted in the general population of the United States as to make any political pressure by them exiguous.

This total lack of political power is a fact that is glossed over by the majority when it righteously dictates that Puerto Ricans' "right to vote in presidential elections is fundamentally a political [issue] and must be [achieved] through political means." Maj. op. at 13. To what "political means" is the majority referring? Political means are precisely what the U.S. citizens of Puerto Rico lack, and cannot create out of thin air as if by alchemy.

Not only do the national political branches lack incentive to act, but, as illustrated by the majority's views,[38]

---

[38]Although I place Judge Lipez's concurrence in a separate category, I disagree with his conclusion that we lack jurisdiction to declare the Congress has failed to take any action to comply with its international obligations. This failure affects the "rights and legal relations of an interested party," the U.S. citizens in question, "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). There is nothing hypothetical about plaintiffs' national disenfranchisement. We have the authority to acknowledge that condition, and Congress' failure to take any action to correct it despite having committed, under binding international law, to do so. Judge Lipez misstates the issues as framed by my dissent when he focuses on Congress' failure "to either admit[] Puerto Rico as a state or propose[] . . . [a constitutional] amendment." Supra at 21 (Lipez, J., concurring).

-52-

this disincentive has also been manifested in the Third Branch, which, if the truth be told, laid the groundwork for this state of affairs with its decisions in the Insular Cases and Balzac, and continues to perpetuate the inherent inequalities thus created.

The Supreme Court therefore has every reason to reconsider the Insular Cases and Balzac. They are the product of an era which is a blot on our national and judicial history. The basis upon which they were premised -- that the United States could hold territories and their inhabitants in a colonial status ad infinitum -- was unprecedented and unauthorized by the Constitution. The interpretation given by the Insular Cases and Balzac to the Constitution permits the perpetuation, without limitation, of a class of citizens unequal in rights to the rest of the body politic, an anachronism that is unsupportable morally, logically or legally.

Furthermore, the underpinnings to this doctrine have since been eroded. If there ever were a justification for their outcome based on the expediency of the historical epoch during which they were decided, this justification can no longer be sustained. Since the Insular Cases and Balzac were decided, Plessy

Although those are among the remedial options available, it makes no difference whether it be these or other alternatives that Congress adopts. The only unavailable option is to do nothing, because that is a violation of an international pledge which has become United States law. Failure to act has legal consequences that create a case and controversy legally cognizable by a declaratory judgment even if relief is not available.

has been reversed by Brown, making racial discrimination legally and ethically unacceptable. Discrimination on the basis of locality makes as much sense as such opprobrious conduct based on race. Moreover, the idea, expressed in Balzac, that the right to trial by jury is not a fundamental constitutional right is no longer the law of the land. See Duncan, 391 U.S. at 154. Balzac's ruling has therefore ceased to be the law of the land.

Puerto Rico is part of the First Circuit. An Article III District Court sits there, providing nearly one-third of the appeals filed before this court, which sits in Puerto Rico at least twice a year, also in the exercise of Article III power. One active judge of this court resides in Puerto Rico and participates in cases that are often of national importance, but is nonetheless disenfranchised from voting for national offices. How can the Constitution be applied in such a Balkanized, arbitrary and irrational manner? See Downes, 182 U.S. at 374 (Fuller, C.J., dissenting) ("[T]he language of the Constitution is too plain and unambiguous to permit its meaning to be thus influenced.").

The proposition that Puerto Rico "belong[s] to . . . but [is] not a part of the United States," Downes, 181 U.S. at 287, like the "separate but equal" concept endorsed in Plessy, belongs to the Dark Ages of American constitutional law and should be relegated to a period in our history best forgotten.

## A. **The right to vote is a fundamental constitutional right**

The right to vote is a fundamental right, which our Constitution guarantees to all citizens. See, e.g., Bush v. Gore, 531 U.S. 98, 104 (2000); Burson v. Freeman, 504 U.S. 191, 198 (1992); Tashjian v. Republican Party, 479 U.S. 208 (1986); Buckley v. Valeo, 424 U.S. 1, 49 n.55 (1976); Lubin v. Panish, 415 U.S. 709, 721 (1974); Bullock v. Carter, 405 U.S. 134 (1972); Phoenix v. Kolodziejski, 399 U.S. 204 (1970); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 667 (1966); Reynolds v. Sims, 377 U.S. 533, 561-562 (1964); Wesberry v. Sanders, 376 U.S. 1, 7 (1964).

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

Wesberry, 376 U.S. at 17-18. "[H]istory has seen a continuing expansion of the scope of the right of suffrage in this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555 (1964) (footnote omitted).

Fundamental voting rights protections should apply fully to U.S. citizens residing in Puerto Rico. Even under the notorious Insular Cases, it has been held that the Constitution extends

-55-

fundamental rights to Puerto Rico.  See Balzac, 258 U.S. at 312-13. The Fifth Amendment is fully applicable to the actions of the U.S. government in Puerto Rico.  Cf. Examining Bd. of Engineers v. Flores de Otero, 426 U.S. 572 (1976).  Although not identical to that of the Fourteenth Amendment, an equal protection component is part of the due process clause of the Fifth Amendment, and serves to constrain the United States.  See Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954) (holding that despite lack of explicit equal protection clause, "discrimination may be so unjustifiable as to be violative of due process").  The utter failure of the government of the United States to take any action to protect its citizens in Puerto Rico from continued national disenfranchisement is a violation of due process and equal protection under the Fifth Amendment of the Constitution.

## B.  **International law**

In addition to the right to vote enshrined in its Constitution, the United States is also bound, both domestically and internationally, by guarantees of voting rights found in international law.  Historically referred to as "the law of nations," international law incorporates both treaty law and customary international law.  Restatement (Third) of Foreign Relations Law of the United States § 102 (2004) ("Restatement").  Thus conceived, international law has been an integral part of our constitutional and legal system since the founding of our Nation.

See <u>Sosa</u> v. <u>Alvarez-Machain</u>, 124 S. Ct. 2739, 2764 (2004) ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."); <u>The Paquete Habana</u>, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination."); <u>The Nereide</u>, 13 U.S. (9 Cranch) 388, 423 (1815) ("[T]he Court is bound by the law of nations which is part of the law of the land."). The importance placed on international law, from the founding of the United States, as a component of the nation's legal system is evident in its Constitution, which authorized Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations," U.S. Const. art. I, § 8, cl. 10, granted the President the power, "by and with the Advice and Consent of the Senate, to make Treaties," <u>id.</u> art. II, § 2, cl. 2, and extended the Article III authority of the federal judiciary to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States,[39] and Treaties made, or which shall be made," <u>id.</u> art. III, § 2, cl. 1. It also provided that "[t]his Constitution, and the Laws of the United States which shall be made

_____

[39]Customary international law is part of the "Law[] of the United States" within the meaning of Article III. <u>See</u>, <u>e.g.</u>, <u>Sosa</u>, 124 S.Ct. at 2764 ("[T]he domestic law of the United States recognizes the law of nations."); <u>see also</u> Restatement § 111, cmt. e; Louis Henkin, <u>International Law as Law in the United States</u>, 82 Mich. L. Rev. 1555, 1566 (1982).

in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Id. art. VI, cl. 2. In light of the historical significance of international law, the Supreme Court has recently recognized that "[i]t would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals." Sosa, 124 S.Ct. at 2764-65.

We look to the treaties and conventions to which the United States is a party, both to determine whether they impose a direct obligation on the United States that is relevant to plaintiffs-appellants' claims, and, in combination with widely-observed legal norms and practices among the nations of the world today, as evidence of binding customary international law that would support plaintiffs-appellants' claims. See Restatement § 102 (identifying sources of customary international law); see also id. § 103 (identifying secondary evidence of international law).

The United States has participated in several international instruments relevant to the issue before us: (1) the Universal Declaration of Human Rights ("UDHR") G.A. Res. 217 A (III), U.N. Doc. A/810 (1948); (2) the American Declaration of the Rights and Duties of Man ("American Declaration"), O.A.S. Res. XXX

(1948), O.A.S. Off. Rec. OEA/Ser. L/V/I.4 Rev. (1965)  (3) the Inter-American Democratic Charter of the Organization of American States ("IADC"), 28th Spec. Sess., OAS Doc. OEA/Ser. P/AG/RES.1 (XXVIII-E/01) (OAS General Assembly) (Sept. 11, 2001), and (4) the International Covenant on Civil and Political Rights ("ICCPR"), opened for signature Dec 16, 1966, 999 U.N.T.S. 171.[40]

In 1948, the member states of the General Assembly of the United Nations, including the United States, proclaimed the UDHR, which states:

> 1.  Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.
>
> . . . [and that]
>
> 3.  The will of the people shall be . . . expressed in periodic and genuine elections which shall be by universal and equal suffrage . . . .

UDHR art. 21.

Although the Supreme Court has ruled that "the [UDHR] does not of its own force impose obligations as a matter of international law," Sosa, 124 S. Ct. at 2767, it has nevertheless recognized its "moral authority," id., and has cited to its

---

[40] In addition, the American Convention of Human Rights("ACHR"), adopted in 1969 and signed by twenty-six countries (not including the United States) between 1969 and 2000, provides in Article 23(1) that "every citizen shall enjoy . . . rights and opportunities:  . . . to vote . . . in genuine periodic elections, which shall be by universal and equal suffrage . . . ."  ACHR, opened for signature Nov. 22, 1969, 1144 U.N.T.S. 123 (entered into force Jul. 18, 1978).

provisions on several occasions. See Knight v. Florida, 528 U.S. 990, 996 (1999) (Breyer, J., dissenting) (noting U.N. Human Rights Committee decisions that a ten-year delay between death sentence and execution is not necessarily a violation of UDHR as informative precedent in Eighth Amendment case); Dandridge v. Williams, 397 U.S. 471, 520 n.14 (1970) (citing UDHR Article 25 as informative "[o]n the issue of whether there is a 'right' to welfare assistance"); Zemel v. Rusk, 381 U.S. 1, 14 n.13 (1965) (citing UDHR Article 13 in discussion of scope of due process); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 161 n.16 (1963) (noting, in rejecting revocation of U.S. citizenship as consequence of remaining abroad to evade military service, the UDHR's guarantee "of the right of every citizen to retain a nationality"); Am. Fed'n of Labor v. Am. Sash & Door Co., 335 U.S. 538, 549 n.5 (1949) (Frankfurter, J., concurring) (citing UDHR provisions on freedom from mandatory association in context of discussing foreign standards of labor law).

Beyond the UDHR, Article XX of the American Declaration, agreed to in 1948 by all of the member States of the Organization of American States, including the United States, provides that: "[e]very person having legal capacity is entitled to participate in the government of his country, directly or through his representatives, and to take part in popular elections . . . ."

In 2001, the United States joined thirty-four other countries in this hemisphere in adopting the IADC. Coincidentally, this occurred at a Special General Assembly of the Organization of the American States meeting in Lima, Peru on the fateful day of September 11, 2001. The importance of this agreement to the United States can be gauged by what took place there and by the actions of Secretary of State Collin Powell, who headed the U.S. delegation at that meeting. After thanking the gathered delegates for their expressions of solidarity and condolences for the terrorist attacks that had occurred that day against the United States homeland, the Secretary stated:

> It is important that I remain here for a bit longer in order to be part of the consensus of this new charter on democracy. That is the most important thing that I can do before departing to go back to Washington, D.C. and attend the important business that awaits me and my other colleagues . . . . I hope we can move the order of business to the adoption of the Charter because I very much want to express the United States' commitment to democracy in this hemisphere . . . . And we unite behind it as democratic nations committed to individual liberties . . . .

Secretary Colin Powell, Statement at the Special General Assembly of the Organization of American States (Sep. 11, 2001), available at http://www.state.gov/secretary/rm/2001/5656.htm. Thereafter, the Special Assembly adopted the IADC, which among other relevant provisions states:

Article 2

The effective exercise of representative democracy is the basis for the rule of law and constitutional regimes of the member states

. . . .

Article 3

Essential elements of representative democracy include, inter alia . . . the holding of periodic, and fair elections based on secret balloting and universal suffrage as an expression of the sovereignty of the people

. . . .

Article 6

It is the right and responsibility of all citizens to participate in decisions relating to their own development. This is also a necessary condition for the full and effective exercise of democracy . . . .

Prior to the approval of the IADC, however, the United States had already entered into another international agreement whose provisions are of singular importance to the issue before us. By virtue of the ICCPR, which came into force on March 23, 1976, and was ratified by the Senate on April 12, 1992, see 138 Cong. Rec. S4781, S4783, the United States committed, in clear and unambiguous terms, that "[e]very citizen shall have the right and the opportunity . . . [t]o vote . . . at genuine periodic elections which shall be by universal and equal suffrage . . . ." ICCPR art. 25. Furthermore, in ratifying Article 2, Paragraph 1, the United States agreed that it would "undertake[] to respect and to ensure

to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant . . . without distinction of any kind . . . ." Most important, and central to the issue before us, the signatory nations committed themselves that:

> [W]here not already provided for by existing legislati[on] . . . each State Party . . . <u>undertakes to take necessary steps, in accordance with its constitutional processes</u> and with the provisions of the present Covenant, <u>to adopt such legislation or other measures</u> as may be necessary to give effect to the rights recognized in the present Covenant.

<u>Id.</u> art. 2, para. 2 (emphasis added).[41]

We turn now to an examination of the United States' obligations under these international instruments and the customary international law to which they contribute.

**1. Treaty obligations**

By 1992, 103 nations had become parties to the ICCPR, with another five, including the United States, having signed. On April, 12, 1992, as required by the Constitution, two-thirds of the United States Senate voted in favor of ratifying the ICCPR. 138

---

[41]The United States further agreed to an enforcement mechanism for the realization and security of the rights established in the ICCPR. Each State Party undertook "[t]o ensure that any person whose [ICCPR] rights or freedoms . . . are violated <u>shall have an effective remedy</u>," to ensure that these rights would be "<u>determined by competent judicial, administrative or legislative authorities</u>, or by any competent authority provided for by the legal system of the State," and that "the possibilities of judicial remedy" would be developed. <u>Id.</u> art. 2, para. 3 (emphasis added).

Cong. Rec. S4781, S4783. Under Article VI, Clause 2 of the Constitution, a treaty thus ratified has equal status to an act of Congress. That is, a treaty _is_ law of the United States. See, e.g., Jordan J. Paust, _International Law as Law of the United States_ 99-105, 120 (2d ed. 2002). As with statutes, a later treaty supercedes inconsistent earlier-enacted statute, provided the treaty provision on the subject is self-executing. _Whitney_ v. _Robertson_, 124 U.S. 190, 194 (1888).

When it ratified the ICCPR, however, the Senate also issued a declaration to the effect that the substantive provisions of the ICCPR would not be self-executing.[42]   138 Cong. Rec. at

---

[42] The Senate also made actual reservations under which its obligations to comply with various provisions of the ICCPR were limited. See 138 Cong. Rec. S4781, S4783 (stating, _inter alia_, that the United States will not take any steps to comply with ICCPR Article 20 that would infringe on the right of free speech and association; reiterating the applicability of capital punishment for adults and minors; deeming ICCPR Article 7 prohibitions on "cruel, inhuman or degrading treatment or punishment" to apply only to treatment deemed "cruel and unusual" under domestic constitutional law; declining to adhere to ICCPR Article 15, Paragraph 1; and reserving the right to treat juveniles, under certain circumstances, as adults, notwithstanding the provisions of ICCPR Article 10, Paragraphs 2(b) and 3, and Article 14, Paragraph 4).

In contrast, _no reservations or other limitations to the specific obligations contained in Article 25 were made_, aside from the declaration of non-self-execution applicable to all substantive articles of the ICCPR. _Id_. This is indicative of the Senate's intent to accept the obligation of full compliance with that provision of the ICCPR. See also _id_. at S4784 (adding the Understanding "[t]hat the United States understands that this Covenant _shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein_, and otherwise by the state and local governments," and that "the Federal Government shall take measures appropriate to the Federal system" to ensure that "state or local

S4784. I wholeheartedly agree with Judge Howard's conclusion that this declaration is not binding on this court, and that further inquiry to determine whether the ICCPR is indeed non-self-executing is required. See infra at 89 (Howard, J., dissenting). I will not attempt to restate his sound reasoning here. However, even if this approach is not accepted, this court is not, as explained below, entirely without power to act.

If the ICCPR were not self-executing, the treaty, qua treaty, could not be invoked by a private citizen as the basis for a court of the United States to order that citizen's full participation in the electoral processes of the United States. See Sosa, 124 S. Ct. at 2767 (recognizing the internationally-binding nature of the ICCPR, but observing that "the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts").[43] That is, a court of the United States could not use the requirement, established in Article 25 of the ICCPR,

---

governments may take appropriate measures for the fulfillment of the Covenant" for matters under their jurisdiction) (emphasis added); Exec. Order No. 13,107, 63 Fed. Reg. 68,991 (Dec. 10, 1998) ("It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under international human rights treaties to which it is a party, including the ICCPR . . . .").

[43]As Judge Howard notes, this statement from Sosa is not at odds with the conclusion that the non-self-execution declaration is not, itself, binding on the courts. See infra at 105, n.63 (Howard, J., dissenting).

that "[e]very citizen shall have the right and opportunity . . . to vote," as the basis for enforcing an individual's right to participate in the electoral processes of the United States, until such time as there has been municipal implementation of Article 25 by the enactment of intra-national legislation or constitutional provision. Neither could the courts of the United States order that the legislative branch of government live up to the obligations undertaken by the United States to "adopt such legislation or other measures as may be necessary to give effect to [the right to vote established in Article 25 of the ICCPR]." ICCPR art. 2, para. 2. Such an intromission would violate the constitutional principle of separation of powers. See Smith & Lee Assocs., Inc. v. City of Taylor, Mich., 102 F.3d 781, 797 (6th Cir. 1996) ("Federal Courts do have jurisdiction and power to pass upon the constitutionality of Acts of Congress, but we are not aware of any decision extending this power in Federal Courts to order Congress to enact legislation. To do so would constitute encroachment upon the functions of a legislative body and would violate the time-honored principle of separation of powers of the three great departments of our Government."). The majority's contentions regarding the trumping of treaty provisions by the Constitution, maj. op. at 7, are thus inapposite, as I recognize the validity of this hierarchy and am not in any way proposing its violation.

That said, however, it is an undisputed fact that, contrary to the requirements of Article 2, Paragraph 2 of the ICCPR, the United States has taken no steps, to date, to implement the obligations undertaken therein.  More directly on point, the United States has not enacted any legislation, passed any constitutional provision, or even put in motion any process directed at nationally enfranchising the nearly four million United States citizens residing in Puerto Rico, notwithstanding its ratification of the ICCPR and the Senate's acknowledgment "[t]hat the United States understands that this Covenant <u>shall be implemented</u> by the Federal Government."  138 Cong. Rec. S4781, S4784 (emphasis added).  Accordingly, the United States is not in compliance with the binding obligations it undertook by signing and ratifying the ICCPR.  The majority does not and cannot refute this undeniable fact, and, as explained below, the potentially non-self-executing nature of the ICCPR does not preclude our ability to make a declaration to that effect, <u>see</u> <u>infra</u> Part III.C.

## 2.  Customary international law

Customary international law constitutes "those clear and unambiguous rules by which States universally[44] abide, or to which

---

[44]The universality requirement does not imply that compliance with customary international law norms be perfect.  "States need not be universally successful in implementing the principle in order for a rule of customary international law to arise. If that were the case, there would be no need for customary international law. But the principle must be more than merely professed or aspirational."  <u>Flores</u>, 406 F.3d at 80; <u>see also</u> <u>Restatement</u> § 102,

they accede, out of a sense of legal obligation and mutual concern . . . ." Flores v. S. Peru Copper Corp., 406 F.3d 65, 84 (2d Cir. 2003). The norm in question must be "specific, universal and obligatory," In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir. 1994), and must be a matter of "mutual, and not merely several concern . . . ." Flores, 406 F.3d at 81 (quoting Filartiga v. Peña-Irala, 630 F.2d 876, 888 (2d Cir. 1980)).

Although the test is demanding, the content of customary international law is not fixed and immutable. See Sosa, 124 S. Ct. at 2761-62 ("[W]e think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."); Filartiga, 630 F.2d at 881 ("[I]t is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today.") (citing Ware v Hylton, 3 U.S. (3 Dall.) 199 (1796) (distinguishing "ancient" from "modern" law of nations)). We look to international instruments setting forth "clear and unambiguous rules," Flores, 406 F.3d at 84, and to other indications of widespread compliance motivated by a sense of legal obligation, by the nations of the world to establish the content of customary

cmt. b.

international law.  See id. at 82-84; Restatement § 102 (2) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.").

The ICCPR, the UDHR, the American Declaration, the ACHR and the IADC are all evidence of the emergence of a norm of customary international law with an independent and binding juridical status.  See Restatement § 102(3) ("International agreements . . . may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.").  The right to equal political participation required by these instruments, as outlined above, is clear and unambiguous.  The ICCPR, for example, admits of no doubt when it states that "[e]very citizen shall have the right and the opportunity . . . [t]o vote . . . at genuine periodic elections which shall be by universal and equal suffrage . . . ."  ICCPR art. 25.  The universal acceptance of this right to equal political participation is demonstrated by the prevalence of the right in a variety of multinational and regional agreements, and by the broad acceptance of those agreements by the countries of the world.  Currently, for example, 163 nations of the 191-member United Nations are parties to the ICCPR, with an additional seven signatories that have not yet ratified the treaty.

The right to equal political participation, as evidenced by these international treaties, covenants, and declarations, is reinforced by what has become the overwhelming practice worldwide. See, e.g., Enrique Lagos & Timothy D. Rudy, In Defense of Democracy, 35 U. Miami Inter-Am. L. Rev. 283, 288-89 (2004) ("Democracy as an international law norm has been 'emerging' for some time, especially in the western hemisphere."); Fernando R. Tesón, "Changing Perceptions of Domestic Jurisdiction and Intervention," in Beyond Soverignty:  Collectively Defending Democracy in the Americas 35 (Tom Farer ed., 1996) ("[t]here can be little doubt that a principle of democratic rule is today part of international law").  From an exiguous minimum of only twenty-two democratic governments out of 154 sovereign states elected by universal suffrage in competitive multiparty elections in 1950, the number of democratic states to 120 out a total of 192 nations in the year 2000.  Freedom House, Democracy's Century:  A Survey of Global Political Change in the 20th Century 2 (1999).  While the system of democratic government may differ from country to country, the fundamental right of citizens to participate,[45] directly or indirectly, in the process of electing their leaders is at the heart of all democratic governments.  See, e.g., James Crawford,

_____

[45] See, e.g., Freedom House, List of Electoral Democracies, at www.freedomhouse.org/research/freeworld/2003/tables.htm   (2003) (listing 121 countries which have at least four different systems of democracy including parliamentary, federal parliamentary, presidential parliamentary, and federal presidential parliamentary).

"Democracy and the Body of International Law," in Democratic Governance and International Law 93 (Gregory Fox & Brad R. Roth eds., 2000) ("[t]hat the will of the people is to be the basis of the authority of government is as good a summary as any of the basic democratic idea").

We cannot overlook, and in fact we should take judicial notice of, the many official actions of the United States in promoting democratic elections throughout the world -- not the least of which is its support for the recently held national elections in Afghanistan and Iraq,[46] places where thousands of U.S. citizens from Puerto Rico serve, AP State & Local Wire, A Package of News Briefs from the Caribbean, Mar. 19, 2005 (reporting 1800 Puerto Ricans currently stationed in Iraq, Kuwait, Afghanistan and Bosnia), at least twenty-five of whom have lost their lives in support of the rights of the citizens of those countries to vote. Id. The situations in Iraq and Afghanistan present the further anomaly of two classes of U.S. citizens, both fighting and dying side by side, only one of which was able to vote for its Commander

---

[46] See Afghans Studying the Art of Voting, N.Y. Times, Oct. 4, 2004, at A1 (discussing Afghanistan's first ever democratic elections); David E. Sanger & Stephen R. Weisman, The Iraqi Election:  The White House; Bush Hails Vote, N.Y. Times, Jan. 31, 2005, at A1 (reporting that President Bush called the election in Iraq a "triumphant moment in his efforts to spur democratic movements throughout [the] Middle East"); Steven R. Weisman, U.S. Asks Others to Pressure Iraq to Be Inclusive, N.Y. Times, Jun. 12, 2005, at A1 (reporting that U.S. seeks to "enlist [] Europe, the Arab world and the United Nations to pressure the Bagdad government to include minorities in the political process").

in Chief.  See Uniformed and Overseas Citizens Absentee Voting Act § 102, 42 U.S.C. § 1973ff-1(a) (requiring states to permit absentee voting by overseas military personnel).

But most important, in what may be the ultimate example of not seeing the forest for the trees, there are few countries in the world in which the right to vote is as exalted as it is in the United States.  See Wesberry, 376 U.S. at 17 ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").  Furthermore, the right to vote is directly protected by Federal statute, which provides both civil and criminal penalties for interference therewith, see Voting Rights Act § 12, 42 U.S.C. § 1973, by several constitutional amendments, see U.S. Const., amend. XV (prohibiting discrimination in voting rights because of race); id. amend. XIX (prohibiting voting discrimination by reason of gender); id. amend. XXIII (granting the residents of the District of Columbia the right to vote for the President of the United States); id. amend. XXIV (prohibiting poll tax); id. amend. XXVI (extending the right to vote to all citizens over the age of 18); see also, e.g., Proclamation No. 7806, 69 Fed. Reg. 52,987 (Aug. 26, 2004) (concerning women's right to vote); Proclamation No. 7584, 67 Fed. Reg. 55,317 (Aug. 23, 2002) (concerning Afghan women's right to vote); Proclamation No. 6924, 61 Fed. Reg. 51,767 (Oct. 2, 1996) (concerning right to vote for

citizens aged between 18 and 21); Der Reichman, Bush Promotes Democracy in Hemisphere of the Americas, San Juan Star, Jun. 5, 2005, at 11 (in a speech before the Organization of American States, President Bush urged that entity to monitor democratic progress in the hemisphere, check the credibility of elections, and offer a vision of hope "founded on representative government").

In light of the proliferation and widespread acceptance of, and compliance with, international instruments that specifically require a right to equal political participation by all citizens, we should conclude that such a right is a norm of customary international law.

At least some components of customary international law are incorporated into United States domestic law as federal common law. See Sosa, 124 S.Ct. at 2764-65 (recognizing a class of international law claims as judicially enforceable federal common law); Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995)(terming it a "settled proposition that federal common law incorporates international law"); 13B Charles Alan Wright, et al., Federal Practice & Procedure: Jurisdiction 2d, § 3585, at 329 (2d ed., 1984) ("[T]oday it is not difficult to conclude that customary international law is part of federal common law . . . .").

The Supreme Court in Sosa recognized that certain claims based on customary international law, as a result of their status as federal common law, can be enforced in the federal courts under

the Alien Tort Statute, 28 U.S.C. § 1350.  See Sosa, 124 S.Ct. 2764-65.  Although the Alien Tort Statute grants jurisdiction only over "causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States," 28 U.S.C. § 1350, the Sosa court did not foreclose the possibility of directly enforcing some customary international law claims through the federal common law when federal jurisdiction is based on other grounds.  See Sosa, 124 S.Ct. at 2765, n.19 (expressing doubt, but leaving open possibility of common law claims for violation of customary international law when jurisdiction is based on 28 U.S.C. § 1331); cf. id. at 2761 (noting that, at least under Alien Tort Statute, no legal development "has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law").  In light of legislative history that indicates Congress's intent to extend federal jurisdiction over cases "arising under" federal law to the fullest extent the Constitution would allow, see 2 Cong. Rec. 4986-87 (1874) ("The [Judiciary] [A]ct of 1789 did not confer the whole [judicial] power which the Constitution conferred . . . .  This bill does.  . . . This bill gives precisely the power which the Constitution confers -- nothing more, nothing less."), we should conclude that the jurisdiction conferred by 28 U.S.C. § 1331 can encompass claims arising under customary international law as incorporated into the federal common law.

The Supreme Court limited recognizable claims, however, to "a narrow class of international norms." Sosa, 124 S. Ct. at 2764. Specifically, "courts should require any claim based on the present-day law of nations to rest on a norm [1] of international character [2] accepted by the civilized world and [3] defined with a specificity comparable to the features of the 18th-century paradigms" that were recognized at that time as actionable violations of the law of nations. Id. at 2761-62. These were violations of international law that "admitt[ed] of a judicial remedy and at the same time threaten[ed] serious consequences in international affairs," such as the 18th-century prohibitions on violation of safe conducts, infringement of the rights of ambassadors, and piracy. Id. at 2756.

As established above, the first two requirements -- international character and broad acceptance -- have been met in the case of the customary international law requirement that citizens be permitted full and equal participation in their government. Furthermore, this norm is defined with a specificity comparable to the international law norms recognized as actionable at the founding of our nation. Its requirements are clear and definite,[47] and the failure to fulfill it can indeed threaten

---

[47] Compare the language of the international instruments described above with the extended discussion of the definition of "piracy" in United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-63 (1820) and the comment in the dissent that the reason such lengthy discussion and definition was the "uncertainty which it was known existed on the subject in the law of nations . . . ." Id. at 170-71

serious consequences in international affairs, as evidenced by the pressure exerted by the United States and other governments on non-democratic regimes abroad.  Cf. Case 11.204, Inter-Am. C.H.R. 727, OEA/ser.L/V/II.118, doc. 5 rev. 2 (2003) (finding by Inter-American Commission of Human Rights that the United States "is responsible for violations of Petitioners' rights under Articles II and XX of the American Declaration by denying [citizens of the District of Columbia] an effective opportunity to participate in their federal legislature").

Because the right to equal political participation by all citizens meets all of the elements required of an enforceable norm of customary international law, there should be no question that it is incorporated into the domestic law of the United States as federal common law to be applied by the federal courts.  See Sosa, 124 S.Ct. at 2764-65.  Moreover, it is clear that the United States is in violation of that norm with respect to the residents of Puerto Rico.  Were we to avoid this conclusion, we would not just be "avert[ing] [our] gaze entirely from [an] international norm intended to protect individuals," id., but would be placing our heads into the sand to avoid seeing the obvious.

In my view, the majority's refusal to incorporate the clear and specific customary international law norm requiring equal political participation into federal common law contravenes both

_____

(Livingston, J., dissenting).

-76-

the specific language of the Constitution, see U.S. Const. art. VI, cl. 2, and relevant Supreme Court doctrine, see Sosa, 124 S.Ct. at 2761-62.

The majority's concern that customary international law is a "diffuse and often highly uncertain body of norms," maj. op. at 13, if true regarding other areas of customary international law, is certainly not true of the right to vote, as demonstrated above. Moreover, the majority's contention that "[i]f there exists an international norm of democratic government, it is at a level of generality so high as to be unsuitable for importation into domestic law," maj. op. at 14, misses the point. The international norm at issue here is not "democratic government" generally, but the right to vote in equality with all other citizens of one's nation. The majority studiously fails to provide any example, in any democratic country, in which citizens are classified into voting and non-voting categories. Its reference to Great Britain as an example of diversity in democratic governments in which citizens neither vote for the head of state nor directly for the governing party, hardly proves the point or even stands for the proposition that customary international law tolerates unequal voting rights among citizens of the same country. In Great Britain, the monarch is only symbolically the head of state. Furthermore, I was under the impression that in 1776 we rejected Great Britain's views regarding colonial government.

## C.  **Remedy**

We commence with the premise that plaintiffs-appellants have the right to equal political participation as citizens of the United States, pursuant to customary international law and the ICCPR, both of which are binding on the United States.  As observed, the United States is currently in violation of these requirements.  Given the failure by the United States to take steps to rectify this clear violation of international law, notwithstanding its agreement to do so, see, e.g., Exec. Order No. 13,107, 63 Fed. Reg. 68, 991 (Dec. 10, 1998), this court ought to take such measures as are necessary to protect a discrete group of citizens that is completely under the sovereignty of the United States.  See United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938) ("[P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and . . . may call for correspondingly more searching judicial inquiry.").

Although, assuming the ICCPR is not self-executing, we cannot order legislative action to bring the United States into compliance with its international obligations, a stop-gap measure is available and is justified by plaintiffs-appellants' predicament.  The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

Under this Act, this court may declare the rights, under the ICCPR and customary international law, of the United States citizens residing in Puerto Rico. "It is emphatically the province and duty of the judicial branch to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). The Act provides the courts with the option of "declar[ing] the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added), particularly when a declaratory judgment "will serve a useful purpose in clarifying and settling the legal relations in issue . . . ." Aetna Cas. & Sur. Co. v. Quarles, 92 F.3d 321, 325 (4th Cir. 1937) (internal quotation marks omitted).

The power to provide declaratory relief extends to the power to clarify and settle the legal relations between the United States and the inhabitants of territories under Federal administration. See United States v. Sanchez, 992 F.2d 1143, 1150-53 (11th Cir. 1993), rev'd in part on other grounds, 3 F.3d 366 (11th Cir. 1993) (determining that Puerto Rico is not a separate sovereign for purposes of the double jeopardy clause); see also United States v. Lopez-Andino, 831 F.2d 1164, 1167-68 (1st Cir.

1987) (holding that Puerto Rico is a separate sovereign for double jeopardy purposes). "Courts of the United States have final authority to interpret an international agreement for purposes of applying it as law of the United States." Juda v. United States, 13 Cl. Ct. 667, 678 (Cl. Ct. 1987).

## 1. Redressability

This type of declaratory relief in the present case is fully consistent with the Declaratory Judgment Act, because it is substantially likely that a declaration by this Court that the United States is in violation of international law will result in some form of relief to the United States citizens who reside in Puerto Rico. See Utah v. Evans, 536 U.S. 452, 463-464 (2002). In Evans the Court held that the "redressability" element of standing under Article III and the Declaratory Judgment Act[48] was met in a situation in which it was "'substantially likely'" that a non-party, co-equal branch of government would abide by a federal court's interpretation of the law "'even though they would not be directly bound by such a determination.'" Id. at 460 (quoting Franklin v. Massachusetts, 505 U.S. 788, 803 (1992)). Standing was established because "the practical consequence of [a court order declaring a census-taking method unlawful] would amount to a significant increase in the likelihood that the plaintiff would

---

[48] The "case-or-controversy" requirements of Article III and the Declaratory Judgment Act are co-extensive. See Teva Pharm. USA, Inc. v. Pfizer, Inc., 395 F. 3d 1324, 1340 (Fed. Cir. 2005).

obtain relief [from the President] that directly redresses the injury suffered." Id. at 464 (collecting cases in which standing has been found under similar circumstances).

Similarly, in Juda, one can find an example of the legislative branch following the judiciary's interpretation of international law. In that case, the inhabitants of the Marshall Islands -- which the United States held under trusteeship from the United Nations -- challenged the United States' attempt to unilaterally terminate the Trusteeship Agreement by way of Presidential proclamation, which would have contravened the international agreement with the United Nations. The Claims Court declared that the Trusteeship remained in effect de jure as a matter of international law, and set forth the procedure to be followed by the United States to end it under international law. Id. at 678-82. Although not bound by that judicial roadmap, Congress did in fact follow it. See Joint Resolution to Approve the "Compact of Free Association" between the United States and the Government of Palau, Pub. L. No. 99-658, § 101, 100 Stat. 3672 (1986); U.N. Security Counsel Res. 683 (Dec. 22, 1990) (terminating Trusteeship Agreement).

The parallel between these cases and the present situation is self-evident. Judge Lipez's attempt to distinguish them on the basis that "the likelihood that Congress and the President would follow the court's advice was not just

'substantial,' [in those cases], it was a near certainty . . . . [but] [t]here is nothing approaching such certainty here," supra at 28 (Lipez, J., concurring), is unconvincing. With due respect, it is the concurrence that engages in speculation. It seems to me that the prediction that Congress would ignore a declaratory judgment of this court that the United States is not in compliance with its international obligations is simply contrary to experience. Juda, whether dicta or not, see supra at 27 (Lipez, J., concurring), bears this out. We live in a country of laws in which the norm is for all branches of government to respect and comply with the decisions of the courts, irrespective of how disputed they may be. See, e.g., Bush v. Gore, 531 U.S. 98 (2000). I cannot countenance that Congress -- nor, for that matter, the Executive, which negotiated the ICCPR and is thus intimately involved and committed -- would ignore a judgment of this court declaring that the government has taken no action to comply with an international obligation of the United States, negotiated and agreed to by the Executive Branch with the advice and consent of the Senate.

The difficulty, complexity, or length of the process required for the United States to comply with the law of the land is irrelevant, as it has never been a test for redressability of a wrong. Cf. Brown v. Bd. of Educ., 349 U.S. 294, 301 (1955) (ordering racial desegregation of schools occur "with all

deliberate speed"). The U.S. citizens of Puerto Rico have waited over one hundred years to regain the voting rights they lost when the U.S. invaded in 1898. A declaratory judgment would be of some help in speeding up the process of recovering these rights.

Regardless, however, of the inappropriateness and unlikelihood of Congressional inaction in response to a judicial declaration of the rights at issue, it cannot be denied that we lack authority to order Congress to act. Even if Congress chooses to continue on its course of inaction, however, our declaration of the plaintiffs' rights under the ICCPR and customary international law would, itself, provide a form of redress. On this point, Federal Election Commission v. Akins, 524 U.S. 11 (1998), is instructive. In Akins, a group of voters filed an administrative complaint with the Federal Election Commission ("FEC") asking it to force a certain political organization to comply with the reporting requirements for political action committees ("PACs"). See id. at 17. The FEC dismissed the complaint on the ground that the organization did not fit the definition of a PAC under federal law. See id. The voters appealed the FEC's dismissal of their complaint and the FEC defended on the ground that the voters' claim was not redressable. See id. at 19. The FEC argued that, even if it misinterpreted the definition of a PAC, it maintained the option not to act on the voters' complaint as a matter of prosecutorial discretion. See id. at 25. The Court disagreed that the FEC's

discretionary authority deprived the voters of standing.  See id.
The Court explained that, even though the FEC might ultimately
decline to act on the voters' complaint, the voters' injury was
redressed by assuring that the FEC's discretionary decision was
based on a correct understanding of the relevant law.

This case presents an analogous circumstance.  The
plaintiffs have alleged that Congress has an obligation under the
ICCPR and customary international law to further their right to
vote for President and that since the ICCPR was ratified, Congress
has taken no action in this regard.  It is possible that Congress
has not acted in accord with its obligations because it is unaware
of them.  By issuing a declaration stating the plaintiffs' rights
under the ICCPR and customary international law, the court can
correct this potential misunderstanding.  To be sure, an Article
III court cannot order Congress to pass a law, just as it cannot
order the executive to prosecute a particular case.  But, as in
Akins, a declaration can ensure that the government actor in
question (here Congress) exercises its responsibility with a
correct understanding of the relevant legal principles.  This is no
guarantee that the Congress will exercise its discretion favorably
to the plaintiff.  But, as Akins makes clear, there is no such
requirement.  See id. at 25; Evans, 536 U.S. at 464 (stating that
redressability is established where court action "would amount to

a significant increase in the likelihood that the plaintiff would obtain the relief that directly redresses the injury suffered").

Ultimately, I simply do not agree with Judge Lipez's reading of the Utah and Juda cases, nor with his conclusions regarding redressability. Obviously, the ideal remedy would be if we could order that plaintiffs be allowed to vote. Barring a finding that the ICCPR is self-executing, that remedy is not available. Continued non-compliance, however, is a circumstance that cannot be ignored any longer. The honor and credibility of the United States are at stake.

Plaintiffs-appellants, citizens of the United States, are denied the right to vote for the offices of President and Vice President of our nation in violation of the ICCPR and customary international law. Further, it is an unquestionable fact that the United States has not met its obligation under the ICCPR to take steps toward allowing these citizens to exercise this fundamental right. See ICCPR art. 2, para. 2. It must be assumed that the United States will give effect to a judicial declaration stating its failure to meet its obligations in this respect, and, at a minimum, we must ensure that any future inaction by the government is not based on an inaccurate understanding of its obligations under international law.

## 2. "Embarrassment" v. Equality

If the majority were to conclude that plaintiffs-appellants' allegations are not supported by the law, although I obviously disagree with this conclusion, I would accept it as part of the judicial process in which diversity of opinion is a fact of judicial review. However, I cannot accept, and am highly disturbed by, the proposition espoused by the majority that the outcome of this appeal should in any way be dictated by its perception that a declaration by this court that the United States has failed to comply with its treaty obligations might "embarrass" the United States and "could be trumpeted as propaganda in international bodies and elsewhere." Maj. op. at 12. These statements are worrisome because they demonstrate a misperception of the role of federal courts vis-à-vis treaties and other international law. The interpretation of treaties and international law, as an integral part of the law of the land, is a nondelegable judicial duty and function that cannot be avoided by this court. Indeed, federal courts are the final interpreters of treaties. Juda, 13 Cl. Ct. at 678. The United States is just another party in this case, as it is in the thousands that are heard before the federal courts throughout the nation. It has no higher standing than any other party, and is entitled to no higher privilege than private citizens. It is precisely because the courts of the United States are perceived by the world at large as upholding these high

standards of impartiality that a declaration exposing the government's failure to comply with its treaty obligations, rather than "embarrassing" the U.S., as the majority suggests, would have a highly salutary effect by showing the world that we practice what we preach:  the rule of law.

Embarrassment indeed!  The U.S. should be embarrassed at its denying equal rights to four million of its citizens in this day and age.  That fact itself -- particularly in light of the government's intense encouragement of democratic reform in other nations and purported commitment to international instruments that guarantee equal political participation by all citizens -- could be "trumpeted as propaganda in international bodies and elsewhere." Maj. op. at 12.  Was it "embarrassment" that finally reversed Plessy?  If embarrassment is what it takes to give equal rights to the United States citizens of Puerto Rico, maybe a dose is appropriate.

### III.

There comes a point when the courts must intervene to correct a great wrong, particularly one of their own creation, because the political branches of government cannot or will not act.  See, e.g., Brown v. Bd. of Educ., 347 U.S. 483.  This case is such a crossroads in history.  This court cannot further "avert its gaze," Sosa, 124 S.Ct. at 2764-65, without becoming an accomplice

to this monumental injustice to Puerto Rico's nationally disenfranchised United States citizens.

Shortly before the Civil War, Abraham Lincoln said: "As I would not be a slave, so I would not be a master. This expresses my idea of democracy. Whatever differs from this, to the extent of the difference, is no democracy." President Abraham Lincoln, Address to Indiana Regiment (Aug. 1, 19858) in II The Collected Works of Abraham Lincoln 532 (Roy P. Basler ed., 1953) (emphasis removed from original). Substitute "colonized" for "a slave" and "colonizer" for "master" in this quote, and we are where the United States citizens of Puerto Rico find themselves today in their subservient political condition within the United States' political hegemony.

The opinion of the district court should therefore be reversed, and the case remanded for the entry of a declaratory judgment to the effect that the United States has taken no steps to meet its obligations under the ICCPR and customary international law to grant equal voting rights to all citizens in the election of the President and Vice President of the United States.

E pluribus unum.

**HOWARD**, **Circuit Judge**, (dissenting).  The inability of American citizens residing in the territories to participate in the election of our nation's leaders is antithetical to our foundational democratic values.  Like Judge Torruella, Judge Leval of the Second Circuit[49] has observed that excluding these United States citizens from voting for President of the United States poses serious "problems of fairness, resentment and impaired reputation in the community of nations."  Romeu v. Cohen, 265 F.3d 118, 128 (2nd Cir. 2001)(Leval, J., writing separately).

Constructively, Judge Leval has explained in some detail how legislation could constitutionally provide for participation by Puerto Ricans in Presidential elections.  See id. at 128-30; but see id. at 131-36 (Walker, C.J., disputing that Congress has such power, while sharing the concern "that the U.S. citizens residing in the territories are not being afforded a meaningful voice in national governance.").  There is every reason to expect that people of good will serving in our legislative and executive branches would seriously consider Judge Leval's proposal among other options, were the plaintiffs to successfully prosecute this action.  But this is not to endorse any particular implementation of voting rights – the preferences of the people of Puerto Rico are of paramount consideration.  It is instead to acknowledge that there could be approaches beyond what many have assumed.

---

[49]Now Senior Circuit Judge.

More generally, while it may be that the Constitution does not itself confer voting rights upon citizens, generations of Americans have rightly taken as an article of faith their ability to participate in the selection of our national leaders through the franchise.[50] In seeking to participate in the Presidential election, the plaintiffs attempt to assert a right long held by law abiding United States citizens of age, whether at home or abroad, so long as they are not residents of one of the territories. Because the interest represented by the plaintiffs' claim is of paramount importance to our democratic structure, we ought to approach their claim searchingly rather than skeptically,[51] with the understanding that the court's declaratory authority should be exercised to its outermost limits if the claim is

---

[50]"[T]he right to vote, as the citizen's link to his laws and government, is protective of all fundamental rights and privileges." Evans v. Cornman, 398 U.S. 419, 422 (1970). "[M]ost U.S. citizens have a limited, constitutionally enforceable right to vote in presidential elections as those elections are currently configured. The States have uniformly exercised their Article II authority by delegating the power to appoint presidential (and vice-presidential) electors to U.S. citizens residing in the State to be exercised in democratic elections." Romeu, 265 F.3d at 123.

[51]"Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562 (1964); see also Kramer v. Union Free School District, 395 U.S. 621, 626 (1969) ("[C]areful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.").

otherwise viable.  We should take care that the claims of American citizens who assert a basic right to participate in the democratic process do not suffer stillbirth through exacting application of redressability doctrines that, as Judge Torruella has pointed out, have significant flexibility.

Turning directly to the plaintiffs' treaty claim, even if there were a persuasive argument not to accept Judge Torruella's reasoning, the case still should not end at this stage.  This is because plaintiffs' claim under the ICCPR should not be resolved on a motion under Fed. R. Civ. P. 12(b)(6) without an opportunity for record development.[52]

The United States signed the ICCPR in 1977.  Among its provisions, Article 25 provides:

> Every citizen shall have the right and opportunity and without unreasonable restrictions to take part in the conduct of public affairs, directly or through freely chosen representatives and to vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors.

999 U.N.T.S. 171 (opened for signature Dec. 19, 1966).  The Senate did not provide its advice and consent for the ICCPR until 1992. In consenting to the Treaty, the Senate added a declaration stating

---

[52]Beyond my own views expressed here, I agree with much of Judge Torruella's dissent.  In particular, I agree substantially with his reasoning in Parts I., II. B. 1., and II. C. 1. and join him in those respects.

that the ICCPR will be "non-self-executing,"[53] as requested by the executive. S. Exec. Rep. No. 102-23 at 23 (1992) ("[T]he United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing.").[54] From this declaration, one might conclude that the plaintiffs do not have enforceable rights under Article 25 of the Treaty.[55] But in my view, separation of powers considerations prevent a court from relying exclusively on the Senate's declaration to determine that a treaty is non-self-executing. The Supremacy Clause and Article III require a court to examine independently the intentions of the treatymakers to decide if a treaty, by its own force, creates individually enforceable

---

[53]Courts and commentators have used the term "non-self-executing" to mean many things. See D. Cinotti, Note, The New Isolationism: Non-Self-Execution Declarations and Treaties as the Supreme Law of the Land, 91 Geo. L. Rev. 1277, 1279 (2003). For purposes of this opinion, I understand the term to mean that a treaty does not create individually enforceable rights without the passage of implementing legislation. See Columbia Marine Servs., Inc. v. Reffet Ltd., 861 F.2d 18, 21 (2d Cir. 1988) (stating that in order for an action to arise under a treaty for purposes of 28 U.S.C. § 1331, "the treaty must be self-executing, i.e., it must prescribe rules by which private rights may be determined"); J. Paust, Avoiding "Fraudulent" Executive Policy: Analysis of the Covenant on Civil and Political Rights, 42 De Paul L. Rev. 1257, 1258 n.4 (1992) (explaining that the purpose of the non-self-execution declaration in the ICCPR was intended to assure that the Treaty would not create a private cause of action in U.S. courts).

[54]Articles 1 through 27 are the rights-granting provisions of the ICCPR.

[55]It might also be said that as a prudential matter the Senate's declaration precludes relief under the Declaratory Judgment Act. For the reasons expressed herein, I would not decide this prudential question at the motion to dismiss stage.

rights.  While the Senate's preratification view on the matter is entitled to some weight, other facts, including extrinsic evidence concerning the Treaty's negotiation history and international practice under the Treaty, are relevant.  Because the procedural posture of this case has precluded introduction of evidence regarding the ICCPR's negotiation and enforcement history, it is premature to dismiss on the ground that the Treaty does not provide the plaintiffs with enforceable rights.

The Senate's practice of declaring certain treaties to be non-self-executing is of relatively recent origin.[56]  See L. Henkin, Foreign Affairs and the United States Constitution, 201-02 (2d ed. 1996).  This practice has become commonplace especially, although not exclusively, for human rights treaties, see L. Damrosch, The Role of the United States Senate Concerning "Self-Executing" and "Non-Self-Executing" Treaties, 67 Chi-Kent L. Rev. 515, 519-26 (1991), and has been accepted in some quarters, see Restatement (Third) of Foreign Relations Law of the United States § 303, cmt.

---

[56]This practice appears to be, at least in part, a response to the proposed Bricker Amendment, which would have amended the Constitution to require implementing legislation before a treaty could have domestic effect.  See S.J. Res. 130, printed at 98 Cong. Rec. 907-08 (1952).  Some scholars have concluded that the Senate viewed non-self-executing declarations as a way to achieve the objectives of the Bricker Amendment without having to amend the Constitution.  See L. Henkin, U.S. Ratification of Human Rights Conventions: The Ghost of Senator Bricker, 89 Am. J. Int'l L. 341, 348-50 (1995). See also D. Sloss, The Domestication of Int'l Human Rights: Non-Self-Executing Declarations and Human Rights Treaties, 24 Yale J. Int'l L. 129, 173 (1999).

d (1986) (stating that there is no accepted doctrine indicating limits on the conditions that the Senate may impose on its provision of consent), but "without significant discussion," Henkin, Foreign Affairs, supra at 202.

Unlike in some other countries, treaties become part of the fabric of our domestic law upon ratification.  Carlos Manuel Vázquez, Treaty-Based Rights and Remedies of Individuals, 92 Colum. L. Rev. 1082, 1111 (1992) (describing the rule under British law that a treaty does not have domestic effect until Parliament passes implementing legislation).  This is a direct result of the Supremacy Clause, which makes treaties part of the "supreme law of the land" along with federal statutes, federal common law, and the Constitution itself.  U.S. Const. art. VI., cl. 2.[57]  The Constitution's grant of power to the federal judiciary also recognizes that treaties constitute domestic law.  Under article III, § 2, cl. 1, the federal judicial power "extend[s] to all Cases, in Law and Equity arising under . . . Treaties."  The

_____

[57]The Supremacy Clause states:

> This Constitution, and the Laws of the United States made in Pursuance Thereof; and all which shall be made in Pursuance Thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding. (Emphasis supplied).

express language of the Constitution thus provides that a treaty ratified by the President, after the Senate's advice and consent, see U.S. Const. art. II, § 2, cl. 2, is part of our domestic law and may be enforced in a domestic court.

This is not a historical accident, for incorporating treaties into the domestic law was one of the purposes for drafting the Constitution. Under the Articles of Confederation, the States were reluctant to enforce treaties entered into by the national government. In proposing the Virginia Plan as the working draft for the new Constitution, Edmund Randolph complained about the Articles' powerlessness to "cause infractions of treaties . . . to be punished." 1 M. Farrand, The Records of the Federal Convention of 1787 19 (rev. ed. 1996). James Madison shared this view. He claimed that "experience [under the Articles] had evidenced a constant tendency in the States to . . . violate national Treaties . . . ." Id. at 164. The Constitution sought to remedy this tendency by making treaties "the supreme law of the land."

The Framers' intention to establish treaties as law, without further legislative action, is demonstrated by several of the proposals that the Constitutional Convention rejected. One such proposal would have required that treaties be sanctioned by legislation if they were to have "the operation of laws." J. Madison, Notes of Debates in the Federal Convention of 1787 520 (1966 ed.). Another would have established two types of treaties:

one requiring only action by the President and the Senate, and a second requiring additional action by the House of Representatives. See 2 Farrand, supra at 394. The rejection of these proposals illustrates the Framers' intention that all treaties constitute law under the Supremacy Clause.[58] As James Wilson stated: "[The Supremacy Clause] will show the world that we make the faith of treaties a constitutional part of the character of the United States; that we secure [their] performance no longer nominally, for the judges of the United States will be enabled to carry [them] into effect." 2 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 490 (2d ed. 1881).

The expectation that treaties would become operative as domestic law upon ratification is also expressed in the Federalist Papers and the ratification debates within the States. For example, in Federalist No. 22, Alexander Hamilton explained that "the treaties of the United States, to have any force at all, must be considered as part of the law of the land. Their true import, as far as respects individuals, must, like all other laws, be ascertained by judicial determinations." The Federalist No.22 at

---

[58]In a similar vein, the Committee on Style removed from the final version of the Supremacy Clause language that would have given the national government the power to "enforce treaties." The Committee removed this language because it was redundant; the Supremacy Clause already declared that treaties were law. See Farrand, supra, at 389-90.

-96-

150 (C. Rossiter ed. 1961). Similarly, at the North Carolina ratifying convention, one of the Constitution's supporters explained:

> It was necessary that treaties should operate as laws on individuals. They ought to be binding upon us the moment they are made. They involve in their nature not only our own rights, but those of foreigners and should be protected by the federal judiciary.

4 Elliot, supra at 158. Even those opposing ratification shared in this view. "Brutus," in criticizing Article III, stated that he could "readily comprehend what is meant by deciding a case under a treaty. For as treaties will be the law of the land, every person who has rights or privileges secured by a treaty, will have the aid of courts in recovering them." 16 J. Kaminski and G. Saladino, The Documentary History of the Ratification of the Constitution 172 (1984).

One commentator has summarized the founding period evidence as follows:

> [The] historic patterns of expectation demonstrate that most Framers intended all treaties immediately to become binding on the whole nation, superadded to the laws of the land; to be observed by every member of the nation, to be applied by the courts whenever a cause of action arose from or touched upon them; and to prevail over and preemept any existing state action. In these ways, at least, all treaties (to the extent of their grants, guarantees, or obligations) were to be self-executing.

See J. Paust, Self-Executing Treaties, 82 Am. J. Int'l L.

760, 764 (1988).[59]

This understanding quickly found its way into the United States Reports.  See Ware v. Hylton, 3 U.S. (3 Dall.) 199 (1796). Ware concerned the 1783 Peace Treaty with Great Britain.  The plaintiff, a British citizen, claimed that he was owed a debt by a Virginia citizen.  See id. at 199-201.  The defendant claimed that the debt had been extinguished by a 1777 Virginia statute.  See id. The treaty provided, however, that "creditors, on either side, shall meet with no lawful impediment to the recovery of full value of all bona fide debts heretofore contracted."  Id. at 277.  The British plaintiff argued that this treaty provision overrode the Virginia statute and reinstated the debt.  See id. at 209.

Justice Iredell, sitting as a circuit judge, considered whether the treaty was operative without the passage of any additional domestic legislation.  He recognized that, under the law of Great Britain, a treaty would not be operative domestically without implementing legislation, but that the purpose of the Supremacy Clause was to differentiate the effect of treaties under American law:

---

[59]For a fuller discussion, see Paust, supra; Vázquez, supra; and M. Flaherty, History Right?: Historical Scholarship, Original Understanding, and Treaties as "Supreme Law of the Land", 99 Colum. L. Rev. 2095 (1999).  For an alternate interpretation of the Founding period, see J. Yoo, Globalism and the Constitution: Treaties, Non-Self-Execution, and the Original Understanding, 99 Colum. L. Rev. 1955 (1999).

> Under this constitution, therefore, so far as
> a treaty constitutionally is binding, upon
> principles of moral obligation, it is also, by
> the vigor of its own authority, to be executed
> in fact.  It would not otherwise be the
> supreme law, in the new sense provided for,
> and it was so before, in a moral sense. . . .
> [W]hen the constitution was ratified, the case
> as to the treaty in question stood upon the
> same footing, as if every act constituting an
> impediment to a creditor's recovery had been
> expressly repealed, and any further act
> passed, which the public obligation had before
> required, if a repeal alone would not have
> been sufficient.

Id.

The case went to the Supreme Court, where each Justice wrote his own opinion.  No Justice disagreed with Justice Iredell's explanation of the domestic effect of the treaty.  See id. at 237 ("[E]very treaty made by authority of the United States, shall be superior to the constitution and laws of any individual state. . . .") (Chase, J.).  Ware thus supports the view that, when a treaty creates obligations favoring an individual, the individual may enforce the obligation directly in a United States court, even though there is no implementing legislation.[60]  In other words, under American law, treaties can be self-executing.  See Head Money Cases, 112 U.S. 580, 598-99 (1884) ("A treaty . . . is a law of the land as an act of Congress is, whenever its provisions prescribe a

---

[60]In another early case, Chief Justice Marshall echoed this sentiment.  Owings v. Norwood Lessee, 9 U.S. (5 Cranch) 344, 348-49 (1809) ("Whenever a right grows out of, or is protected by a treaty, it is to be protected.").

rule by which the rights of the private citizen . . . may be determined.  And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.").

The suggestion that some treaties are not self-executing first appeared in Foster v. Nielson, 27 U.S. (2 Pet.) 253 (1829), overruled in part by United States v. Percheman, 32 U.S. 51 (1833) (reinterpreting treaty in light of new evidence regarding meaning of ambiguous term).  There, a treaty with Spain, designed to protect private land grants, provided that "grants shall be ratified and confirmed."  Id. at 309.  Writing for the Court, Chief Justice Marshall concluded that the treaty was not self-executing because, by its terms, it did not establish a right in an individual but rather placed an obligation on the legislative branch to act. See id. at 314.  As Chief Justice Marshall explained:

> Our constitution declares a treaty to be the law of the land.  It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract, where either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can be become a rule for the court.

Id.

The Foster rule -- that certain treaties are non-self-executing -- is a judicially-created doctrine.  See Henkin, The

-100-

Ghost of Senator Bricker, supra at 347. Under this doctrine, a court must ascertain whether the instrument was intended by its makers to establish directly enforceable rights, or only to impose an obligation on one of the political branches. See Frolova v. Union of Soviet Socialist Republics, 761 F.2d 30, 373 (7th Cir. 1985) ("Whether a treaty is self-executing is an issue for judicial interpretation."); Restatement supra at § 111, cmt. h ("Whether an agreement is to be given effect without further legislation is an issue that a court must decide when a party seeks to invoke the agreement as law."). Such an intent is to be gleaned from the treaty's terms and history. See Diggs v. Richardson, 555 F.2d 841, 851 (D.C. Cir. 1976) (stating that, "[i]n determining whether a treaty is self-executing courts look to the intent of the signatory parties as manifested by the language of the instrument, and if the instrument is uncertain, recourse must be had to the circumstances surrounding its execution").

Given this constitutional and judicial history, a court ought not quickly conclude that treaties are non-self-executing. Cf. United States v. Li, 206 F.3d 56, 61 (1st Cir. 2000) (en banc) (stating that there is a presumption against self-executing treaties under American law).[61] Rather, a court must conduct an independent and searching inquiry into the treaty's purpose. And

---

[61]Judge Torruella took a similar view in his dissent in Li. See 206 F.3d at 70-71.

on this point a declaration by the Senate that a treaty is non-self-executing should not be dispositive.

Those holding a contrary view tend to regard the Senate's power to declare a treaty non-self-executing to be an adjunct of its general power to consent to ratification. See Restatement supra at § 303, cmt. d. There is no doubt that the Senate may hinge its consent to ratify a treaty on a reservation. See Haver v. Yaker, 76 U.S. (9 Wall.) 32, 35 (1869). But a reservation is a "unilateral statement . . . whereby [one party] purports to exclude or to modify the legal effect of certain provisions of the treaty in the application to that State." Vienna Convention on the Law of Treaties, art. 2(1)(d) (1969). A reservation thus has an actual effect on the terms of the treaty. See M. Glennon, The Constitutional Power of the United States Senate to Condition Its Consent to Treaties, 67 Chi.-Kent. L. Rev. 533, 542 n. 63 (1991) (citing authority). And the reservation will vitiate the Senate's consent if its terms are not incorporated into the treaty. See Henkin, Foreign Affairs, supra at 180-81.

A non-self-execution declaration differs materially from a reservation. See Restatement, supra at § 314, cmt. d. The declaration is not presented to the other international signatories as a request for a modification of the treaty's terms. Rather, it is directed primarily toward United States courts to express "the sense of the Senate" that the treaty should not be interpreted to

establish individually enforceable rights. As two leading

commentators have explained, the Senate does not have the power to

bind a court to such declarations:

> [T]he Senate lacks the constitutional authority to declare the non-self-executing character of a treaty with binding effect on U.S. courts. The Senate has the unicameral power only to consent to ratification of treaties, not to pass domestic legislation. A declaration is not part of a treaty in the sense of modifying the legal obligations created by it. A declaration is merely an expression of an interpretation or of a policy or position. U.S. courts are bound by the Constitution to apply treaties as the law of the land. They are not bound to apply expressions of opinion adopted by the Senate (and concurred in by the President). The courts must undertake their own examination of the terms and context of each provision in a treaty to which the United States is a party and decide whether it is self-executing. The treaty is law. The Senate's declaration is not law. The Senate does not have the power to make law outside the treaty instrument.

S. Riesenfeld & F. Abbott, Foreword: Symposium of Parliamentary

Participation in the Making and Operation of Treaties, 67 Chi.-

Kent L. Rev. 293, 296-97 (1991).[62]

---

[62]Other commentators, including Professor Henkin, share this view. See Henkin, Foreign Affairs, supra at 202 (describing the Senate's practice of declaring treaties as non-self executing to be "anti-Constitutional in spirit and highly problematic as a matter of law"); Henkin, The Ghost of Senator Bricker, supra at 346 (stating that non-self-execution declarations by the Senate "may be unconstitutional"). See also D. Cinnoti, supra; J. Quigley, The Rule of Non-Inquiry and Human Rights Treaties, 45 Cath. L. Rev. 1213 (1995); J. Quigley, The Int'l Covenant on Civil and Political Rights and the Supremacy Clause, 42 De Paul L. Rev. 1287 (1993); Paust, Avoiding Fraudulent Executive Policy, supra; C. Dearborn, Note, The Domestic Legal Effect of Declarations that Treaty

Stated differently, the Senate's power under Article II extends only to the making of reservations that require changes to a treaty before the Senate's consent will be efficacious. A declaration that only has domestic effect is, in reality, an attempt to legislate concerning the internal implementation of a treaty. But the power to legislate is not granted to the Senate under Article II. Legislation may only be enacted through bicameral adoption and presentation to the President as set forth in Article I. See INS v. Chada, 462 U.S. 919 (1983).

The only case that I am aware of that addresses a similar question supports this view. In Power Authority of New York v. Federal Power Commission, 247 F.2d 538 (D.C. Cir.), vacated and remanded with instructions to dismiss as moot 355 U.S. 64 (1957), the United States entered a bilateral treaty with Canada concerning the use of the Niagara River to produce power along the United States/Canada border. See id. at 539. In its resolution consenting to the treaty, the Senate included a reservation whereby the United States reserved the right to redevelop its portion of the power generated on the river only through an act of Congress. See id. The United States and Canada agreed that the reservation only concerned American domestic law and did not require any changes to the treaty. See id. at 540-41.

---

Provisions Are Not-Self-Executing, 57 Tex. L. Rev. 233 (1979).

The Power Authority of the State of New York sought a license from the Federal Power Commission to use the Niagara River for the state's anticipated power project. See id. at 539. The Commission dismissed the authority's license application, contending that the Senate's reservation precluded it from granting such a license because federal legislation was required. See id. at 539-40.

The D.C. Circuit held that the reservation was ineffective because it involved only United States domestic law. For the reservation to be binding on the judiciary, the court reasoned, it had to constitute an actual part of the treaty:

> A true reservation which becomes a part of a treaty is one which alters the effect of the treaty insofar as it may apply in the relations of the State with the other State or States which may be parties to the treaty. It creates a different relationship between the parties and varies the obligations of the parties proposing it.

Id. at 541. Because the reservation was merely an expression of the Senate's view of domestic policy it had no domestic effect. See id.[63]

---

[63]Sosa v. Alvarez-Machian, 124 S. Ct. 2739 (2004) is not to the contrary. That case involved whether the right to be free from arbitrary abduction and detention was protected under customary international law. The plaintiff in Sosa did not sue directly under the ICCPR but rather argued that the Treaty's terms helped establish the relevant principle of customary international law for purposes of his Alien Tort Act claim. The Court relied on the Senate's non-self-execution declaration in the ICCPR as one factor to support its conclusion that the ICCPR could not, by itself, establish a rule of customary international law. See id. at 2763

-105-

The non-self-execution declaration in the ICCPR is a similar expression of the Senate's desire concerning a purely domestic issue. Like the reservation in <u>Power Authority</u>, the declaration was not intended to modify the Treaty terms in any way. Thus, it lacks binding force. <u>Cf.</u> <u>Fourteen Diamond Rings</u> v. <u>United States</u>, 183 U.S. 176, 178-80 (holding that a Senate resolution purporting to interpret a treaty adopted after ratification was not binding). Of course, the Senate's view is relevant. <u>Cf.</u> <u>United States</u> v. <u>Stuart</u>, 489 U.S. 353, 366-67 (1989) (stating that Senate preratification debate is relevant to determining the meaning of a treaty). But, in the end, whether there is a private right of action under the ICCPR should be decided on the basis of the <u>totality</u> of available evidence. <u>See</u> <u>Volkswagenwerk A.G.</u> v. <u>Schlunk</u>, 486 U.S. 694, 700 (1988) ("Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty negotiations, and the practical construction adopted by the parties."); <u>see also</u> <u>Societe Nationale Industrielle Aerospatiale</u> v.

---

& 2767. But the Court was not faced with (and did not decide) whether the Senate's declaration <u>ipso</u> <u>facto</u> prevents a plaintiff from suing directly under the Treaty. Because the question in <u>Sosa</u> was not the binding effect of the Senate's non-self-execution declaration in determining whether the ICCPR establishes a private cause of action, the parties did not present the Court with (and it did not address) the separation of powers arguments questioning the Senate's authority to issue such declarations. <u>See, e.g.</u>, Reply Brief of United States at 8, <u>Sosa</u>, <u>supra</u>.

U.S. Dist. Ct. for the S. Dist. of Iowa, 482 U.S. 522, 534 (1987) (stating that treaty interpretation begins with the text of the treaty, but that the treaty's history and practical construction adopted by the parties are relevant); Air France v. Saks, 470 U.S. 392, 400 (1985) (stating that "in interpreting a treaty it is proper . . . to refer to the records of its drafting and negotiation"); Islamic Rep. of Iran v. Boeing Co., 771 F.2d 1279, 1283 (9th Cir. 1985) (explaining that the most important factor in determining whether a treaty is self-executing is the language, purpose, and intent behind the treaty).

Given the broad judicial inquiry required to determine if a treaty establishes individually enforceable rights and the non-binding nature of the Senate's non-self-execution declaration, I do not think it proper to affirm the dismissal under Fed. R. Civ. P. 12(b)(6). See Paust, Avoiding "Fraudulent" Executive Policy, supra at 1259-62 (suggesting that text of ICCPR indicates that it was intended to be self-executing). We do not have before us sufficient information concerning the negotiation history of the ICCPR or the way in which the other signatories have enforced it. Without such information, we lack the full spectrum of sources necessary to evaluate the extent to which, if at all, the plaintiffs may possess one or more enforceable rights under the Treaty.

A "court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of the actual facts rather than a pleader's suppositions." 5A Wright & Miller, Federal Practice & Procedure, § 1357; see also Doe v. Walker, 193 F.3d 42, 46 (1st Cir. 1999)("Our preference for a better record is well supported and . . . is one which we are entitled to require for reasons of prudence."). When looked at the way I see it, this suit presents a novel claim concerning the right to vote – a right which, as I have said, has special significance. See Wesberry v. Sanders, 376 U.S. 1, 17 (1964) (stating that "no right is more precious in a free country than that of having a voice in the election of those who make the laws, under which, as good citizens, we must live"). Given the sensitive nature of the dispute and its implications, I would permit the parties to develop a record concerning the ICCPR.[64]

---

[64]I am less sanguine about whether plaintiffs may successfully press a claim under customary international law. The most promising avenue for challenging Puerto Rico's status as violative of a customary international norm -- a claim arguing that customary international law recognizes a right of peoples to self-determination and imposes on nations an obligation to decolonize -- more properly belongs not to an individual Puerto Rican, but to the Commonwealth of Puerto Rico itself, the political leadership of which is elected by individual Puerto Ricans and, presumably, would be responsive to the electorate. See, e.g., Duke Power Co. v. Carolina Env. Study Group, Inc., 438 U.S. 59, 80 (1978); Laurence H. Tribe, American Constitutional Law, § 3-19 (3d ed. 2000); Erwin Chemerinsky, Constitutional Law Principles and Policies, § 2.5.4 (2d ed. 2002). In such a lawsuit, there would be less reason for concern that the plaintiffs might be seeking a fundamental change

in the relationship between the Commonwealth and the United States
that many of their fellow Puerto Ricans may not desire.